# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| CONSERVATION LAW FOUNDATION, INC.,<br><br>                                                    Plaintiff<br><br>v.<br><br>BOSTON WATER AND SEWER COMMISSION;<br><br>VINCENT G. MANNERING, in his official capacity as<br>EXECUTIVE DIRECTOR of BOSTON WATER AND<br>SEWER COMMISSION;<br><br>DENNIS A. DIMARZIO, in his official capacity as CHAIRMAN<br>of BOSTON WATER AND SEWER COMMISSION;<br><br>CATHLEEN DOUGLAS STONE, in her official capacity as<br>BOSTON WATER AND SEWER COMMISSIONER; and<br><br>MUHAMMAD ALI-SALAAM, in his official capacity as<br>BOSTON WATER AND SEWER COMMISSIONER,<br><br>                                                    Defendants | Case No.:<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES** |

## INTRODUCTION

1.      This action is a citizen suit brought under Section 505 of the Clean Water Act ("CWA"), 33 U.S.C. § 1365, as amended, to address significant water-quality problems and programmatic deficiencies associated with the Boston Water and Sewer Commission's ("BWSC") municipal separate storm sewer system ("MS4").  Plaintiff seeks declaratory judgments, injunctive relief, and other relief with respect to the actions and failure to act by BWSC, and the Executive Director and Commissioners thereof, in violation the National

Pollutant Discharge Elimination System ("NPDES") permit authorizing discharges from BWSC's MS4; Sections 301(a) and 402(p)(3)(B) of the CWA, 33 U.S.C. §§ 1311(a) and 1342(p)(3)(B); and applicable CWA regulations.

## JURISDICTION AND VENUE

2.      This Court has jurisdiction over the subject matter of this action pursuant to Section 505(a) of the CWA, 33 U.S.C. § 1365(a); 28 U.S.C. § 1331 (federal question); and 28 U.S.C. §§ 2201 and 2202 (declaratory judgment).

3.      Pursuant to Section 505(b)(1)(A) of the CWA, 33 U.S.C. § 1365(b)(1)(A), and 40 C.F.R. § 135, Plaintiff notified Defendants of their violations of the CWA, and of Plaintiff's intent to sue under the CWA, by letter dated and sent to them *via* certified mail on November 24, 2009 ("Notice Letter"). A true and accurate copy of the Notice Letter is attached as Exhibit 1. Plaintiff also sent copies of the Notice Letter to the Administrator of the United States Environmental Protection Agency ("EPA"), the Interim Regional Administrator and current Regional Administrator of EPA Region 1, and the Commissioner of the Massachusetts Department of Environmental Protection.

4.      More than sixty days have passed since Plaintiff mailed Defendants its Notice Letter. The CWA violations complained of in the Notice Letter are of a continuing nature, are ongoing, or are reasonably likely to re-occur. Defendants remain in violation of the CWA. As of the filing of this Complaint, neither EPA nor Massachusetts has commenced an enforcement action to redress the violations identified in the Notice Letter.

5.      Venue is appropriate in the District of Massachusetts pursuant to Section 505(c)(1) of the CWA, 33 U.S.C. § 1365(c)(1), and 28 U.S.C. § 1391(b)(2), because the MS4, and the CWA violations that are the subject of this Complaint, are located in Massachusetts.

## PARTIES

6.     Plaintiff Conservation Law Foundation ("CLF") is a non-profit public interest environmental organization with approximately 3,230 members, including approximately 1,655 members in Massachusetts and ninety members in Boston.   CLF works to solve problems threatening natural resources and communities in Massachusetts and throughout the New England region.   CLF has a long history of advocacy to protect Massachusetts' water resources, including but not limited to advocacy that led to the clean-up of Boston Harbor, advocacy to address stormwater pollution in the Charles River and stormwater discharges by the Massachusetts Highway Department.   CLF members live near waters degraded by Defendants' MS4, and use these waters for recreational and aesthetic enjoyment.   Water quality is critical to CLF's members' use and enjoyment of these waters.   CLF's members have been and are adversely affected by BWSC's violations of the CWA and, until such time as Defendants come into compliance, will continue to be so.

7.     Defendant Boston Water and Sewer Commission ("BWSC") is a body politic and corporate and political subdivision of the Commonwealth of Massachusetts established to operate and maintain the water and sewer systems, including stormwater drainage systems, which serve the City of Boston.   A Board of Commissioners, appointed by the Mayor of Boston and subject to confirmation by the Boston City Council, oversees BWSC's activities.   BWSC, as the permittee, is responsible for compliance with the CWA, including but not limited to the terms of the Permit.

8.     Defendant Vincent G. Mannering is the Executive Director of BWSC and, in this official capacity, is responsible for ensuring that BWSC's MS4 is operated in a manner that complies with the requirements of the CWA and its Permit.

9.     Defendant Dennis A. DiMarzio is the Chairman of the Board of Commissioners of BWSC and, in this official capacity, has responsibility for overseeing the activities of BWSC and ensuring its compliance with the CWA and its Permit.

10.    Defendants Cathleen Douglas Stone and Muhammad Ali-Salaam are members of the Board of Commissioners of BWSC and, in this official capacity, have responsibility for overseeing the activities of BWSC and ensuring its compliance with the CWA and its Permit.

## REGULATORY CONTEXT

### A.     The Clean Water Act and NPDES Permitting

11.    The CWA is the principal federal statute enacted to protect the quality of the Nation's surface water resources.  CWA § 101 *et seq.*, 33 U.S.C. § 1251 *et seq.*  The stated goal of the CWA is "to restore and maintain the chemical, physical and biological integrity of the Nation's waters."  CWA § 101(a)(1), 33 U.S.C. § 1251(a)(1).

12.    Section 301 of the CWA, 33 U.S.C. § 1311, prohibits the discharge of any pollutant, by any person, from any point source to the waters of the United States, including the waters of the contiguous zone or the ocean, except where expressly authorized under a valid NPDES permit issued by EPA or an EPA-delegated State permitting authority.  CWA § 301(a), 33 U.S.C. § 1311(a); CWA § 502(12)(A), (7), 33 U.S.C. § 1362(12)(A), (7); 40 C.F.R. § 122.2.

13.    The Commonwealth of Massachusetts has not established a federally approved state NPDES program pursuant to Section 402(b) of the CWA, 33 U.S.C. § 1342(b).  Therefore, in Massachusetts the NPDES permit program is administered by EPA pursuant to Section 402(a) of the CWA, 33 U.S.C. § 1342(a).

14.    As with all NPDES permits, NPDES permits for MS4 discharges must include limitations necessary to meet water quality standards, or required to implement any applicable

water quality standard.   CWA § 301(b)(1)(C), 33 U.S.C. § 1311(b)(1)(C).   Regulations promulgated pursuant to the CWA prohibit the discharge of pollutants that cause or contribute to the violation of water quality standards.  *See* 40 C.F.R. §§ 122.4(d), 122.44(d).  The CWA also prohibits the discharge of toxic pollutants in toxic amounts, CWA § 101(a)(3), 33 U.S.C. §1251(a)(3), and requires that NPDES permits for MS4s "effectively prohibit non-stormwater discharges into the storm sewers."  CWA § 402(p)(3)(B)(ii), 33 U.S.C. § 1342(p)(3)(B)(ii).

15.     Separate and apart from, and in addition to, the CWA's prohibitions pertaining to water quality, *see* ¶ 14, *supra*, the CWA mandates that NPDES permits issued for MS4s must "require controls to reduce the discharge of pollutants to the maximum extent practicable, including management practices, control techniques and systems, design and engineering methods, and such other provisions as . . . appropriate for the control of such pollutants."  CWA § 402(p)(3)(B)(iii); 33 U.S.C. § 1342(p)(3)(B)(iii).

16.     In furtherance of the CWA's requirements, the CWA's implementing regulations pertaining to MS4 discharges require permittees to estimate, and report on trends regarding,  the cumulative annual loads of specified pollutants – including but not limited to copper, zinc, total phosphorous and total suspended solids – to be discharged from the MS4. 40 C.F.R. § 122.26(d)(2)(iii)(B); *id* § 122.26(d)(2)(iv)(A).   Permittees are further required to estimate reductions in pollutant loads to be achieved through their stormwater quality management program, to assess the effectiveness of such program and related stormwater controls in light of pollutant load trends, and to revise their program and stormwater controls as necessary to address those trends.  40 C.F.R. § 122.26(d)(2)(v); *id.* § 122.42(c)(3).

17.     Violations of NPDES permits constitute violations of the CWA and its implementing regulations and are grounds for enforcement actions under the CWA, including

citizen enforcement actions seeking civil penalties. *See* CWA §§ 301(a), 505(a), 33 U.S.C. §§ 1311(a), 1365(a); 40 C.F.R. § 122.41(a).

### B.    BWSC's NPDES Permit

18.    On September 29, 1999, EPA issued BWSC an NPDES permit, under Section 402 of the CWA, authorizing the discharge from all of BWSC's new or existing separate storm sewers to the following receiving waters: Belle Island Inlet, Boston Harbor, Boston Inner Harbor, Brook Farm Brook, Bussey Brook, Canterbury Brook, Chandler's Pond, Charles River, Chelsea River, Cow Island Pond, Dorchester Bay, Fort Point Channel, Goldsmith Brook, Jamaica Pond, Little Mystic Channel, Mill Pond, Millers River, Mother Brook, Muddy River, Mystic River, Neponset River, Old Harbor, Patten's Cove, Reserved Channel, Sprague Pond, Stony Brook, Turtle Pond and unnamed wetlands, brooks and streams.[1]    The Permit became effective October 29, 1999 and, like all NPDES permits, has a term of five years.

19.    BWSC's Permit presupposes that BWSC has, and imposes the requirement that BWSC shall maintain, "legal authority to control discharges to and from those portions of the MS4 which it owns or operates."  Permit at 10 (Part I.B.5).

20.    BWSC's Permit, which must be implemented in a manner consistent with the mandates of the CWA and the CWA's implementing regulations, contains specific prohibitions against the degradation of water quality.  It prohibits "the discharge of pollutants in quantities that would cause a violation of State water quality standards," the "discharge of toxics in toxic amounts," and the "discharge of a visible oil sheen, foam, or floating solids, in other than trace amounts,"  Permit at 5 (Part I.B.2.a), and it prohibits discharges of non-storm water, including but not limited to wastewater. *Id.* at 2 (Part I.A.3).

---

[1] Authorization to Discharge under the Nat'l Pollutant Discharge Elimination Sys., EPA Permit No. MAS010001 (Sept. 29, 1999) ("Permit") at 1.

21.     Separate and apart from the prohibitions pertaining to the protection of water quality, *see* ¶ 20 *supra*, BWSC's Permit expressly incorporates the "maximum extent practicable" standard set forth in the CWA's provisions pertaining to MS4 permitting, *see* ¶ 15, *supra*.  The Permit specifically requires that BWSC "develop and implement a storm water pollution prevention and management program designed to reduce, to the maximum extent practicable, the discharge of pollutants from the Municipal Separate Storm Sewer System." Permit at 3 (Part I.B).  The stormwater management plan ("SWMP") required by the Permit "is intended to be a tool to achieve the maximum extent practicable [standard] and water quality standards."  U.S. EPA Fact Sheet for Draft Permit (Sept. 2, 1998) ("EPA Draft Permit Fact Sheet") at 10.

22.     BWSC's Permit requires BWSC to implement a wet weather monitoring and reporting program "to provide data necessary to assess the effectiveness and adequacy of control measures implemented under [its Storm Water Management Plan]."  Permit at 13 (Part I.C.1). As part of this program, the Permit requires that BWSC monitor "a minimum of five representative drainage areas to characterize the quality of storm water discharges from the MS4." *Id.* at 14 (Part I.C.1.a).  The purpose of this representative drainage-area monitoring is "to provide representative data on the quality and quantity of discharges from the MS4 as a whole," and to "provide information on the quality of runoff from the MS4, a basis for estimating annual pollutant loadings, and a mechanism to evaluate reductions in pollutants discharged from the MS4."  EPA Draft Permit Fact Sheet at 7-8.

23.     As another element of its wet weather monitoring and reporting program, BWSC's Permit also requires BWSC to monitor "a minimum of four (4) receiving waters three (3) times a year throughout the term of the permit." Permit at 14 (Part I.C.1.b).  The purpose of

this receiving-waters monitoring program is "to assess the impact of storm water discharges from the MS4 to receiving waters.  EPA Fact Sheet at 8.

24.    BWSC's Permit further requires BWSC to develop and implement a wet weather screening program "to identify, investigate, and address areas within [BWSC's] jurisdiction that may be contributing excessive levels of pollutants to the MS4 as a result of rainfall or snowmelt." *Id.* at 16 (Part I.C.6).  The Permit requires that the wet weather screening program include, at a minimum, screening of "all major outfalls at least once during the permit term."[2] *Id.*  The intent of this screening program, which involves physical observations of wet weather flows, is to "identify discharges which may be contributing to water quality impairments short of analytical monitoring."  EPA Fact Sheet at 9.

25.    Consistent with CWA regulatory requirements, *see* ¶ 16, *supra*, BWSC's Permit specifically requires BWSC to estimate annual pollutant loadings from its MS4, Permit at 13 (Part I.C.1), 15 (Part I.C.2), and to review any trends in estimated cumulative pollutant loadings as part of a mandatory annual assessment of its Storm Water Management Plan ("SWMP").  *Id.* at 11 (Parts I.B.7.b, I.B.7.b.3).  The Permit requires that BWSC's SWMP "shall be updated as necessary to ensure conformance with the requirements of CWA § 402(p)(3)(B)."  Permit at 5 (Part I.B.2.a).  *See also id.* at 3 (Part I.B) ("The storm water pollution prevention and management program requirements of this Part shall be implemented through the SWMP submitted as part of the permit application *and revised as necessary*.") (emphasis added).

---

[2] A major outfall is:

> [A] storm drain outfall that discharges from a single pipe with an inside diameter of 36-inches or more or its equivalent, a storm drain outfall that serves more than 50 acres, or a storm drain outfall that discharges from [a] single pipe with an inside diameter of 12-inches or more serving an industrial-zoned area.

BWSC, 2008 Stormwater Management Report at 1-3.

## FACTUAL OVERVIEW

26.    Studies show that stormwater runoff contains a wide variety of pollutants, including priority organics, oil and grease, metals, nutrients, organic constituents, suspended solids, and pathogens.[3]  Stormwater runoff and surface water discharges from municipal storm water sewers are a major cause of water quality impairment in rivers, ponds, reservoirs, estuaries and coastal areas in the United States.[4]  Stormwater runoff causes exceedances of water quality standards by contributing significant amounts of toxicants to receiving waters, changing natural hydrologic patterns, accelerating stream flows, destroying aquatic habitat, and elevating pollutant concentrations and loadings.[5]  In Massachusetts, contaminated stormwater runoff has been found to significantly degrade water quality and aquatic habitat.  Stormwater runoff and discharges from stormwater drain pipes are the largest contributors to water quality problems in the Massachusetts' rivers, streams, and marine waters.[6]  One Massachusetts study found that urban runoff and stormwater are responsible for 46 percent of assessed river segments not supporting their designated use and 48 percent of assessed marine waters not supporting their designated use.[7]

27.    Stormwater pollution is contributing to significant problems plaguing water bodies in eastern Massachusetts.  Those problems include the degradation of numerous water bodies into which BWSC's MS4 discharges stormwater, including but not limited to the Charles,

---

[3] 64 Fed. Reg. 68722 at 68724/3 – 68731/2.

[4] Environmental Impacts of Storm Water Discharges: A National Profile. EPA 841-R-92-001. Office of Water. Washington, DC; 64 Fed. Reg. 68722 at 68724/3 – 68731/2.

[5] 64 Fed. Reg. 68722 at 68724/3 – 68731/2.

[6] Massachusetts Department of Environmental Protection ("DEP"), Stormwater Management Volume One: Stormwater Policy Handbook, March 1997.

[7] Massachusetts DEP, Commonwealth of Massachusetts: Summary of Water Quality, 1995.

Chelsea, Mystic, and Neponset Rivers, and Boston Harbor, each of which is violating state water quality standards for pollutants (in many cases numerous pollutants) associated with stormwater.[8]  Of the above-referenced water bodies, the EPA has approved total maximum daily loads ("TMDLs") for pathogens in the Charles River Watershed, for nutrients in the Lower Charles River Basin, and for bacteria in the Neponset River Basin.[9]  Municipal storm sewer systems, including BWSC's MS4, are identified in the TMDLs as significant contributors of pollutants to these waterways.[10]

28.    BWSC's MS4 serves an area of approximately 17,429 acres, comprising approximately 57 percent of Boston.[11]  It includes approximately 19,708 storm drains, or "catch basins," for the collection of stormwater; 424 miles of storm drainage infrastructure for the *conveyance* of stormwater; and 201 storm drain outfalls for the *discharge* of stormwater.

29.    In the early 1990s, BWSC prepared and submitted to EPA an application for a NPDES permit for its MS4. Its application included the 1993 submission of a Stormwater Management Plan ("SWMP") for the MS4.  The SWMP included a list of seventeen pollution control measures to be implemented under the requested permit.  Of those seventeen pollution

---

[8] Massachusetts Year 2008 Integrated List of Waters, Final Listing of the Condition of Massachusetts' Waters Pursuant to Sections 303(d) and 305(b) of the Clean Water Act (Dec. 2008).

[9] Massachusetts DEP, Final Pathogen Total Maximum Daily Load for the Charles Watershed (Jan. 2007) ("Charles River Pathogen TMDL"), *available at* http://www.mass.gov/dep/water/resources/charles1.pdf; Massachusetts DEP, Final Nutrients Total Maximum Daily Load Report for the Lower Charles River Basin (June 2007) ("Lower Charles River Basin Nutrients TMDL"), *available at* http://www.mass.gov/dep/water/resources/charlesp.doc; and Massachusetts DEP, Total Maximum Daily Loads of Bacteria for the Neponset River Basin (May 2002) ("Neponset River Basin Bacteria TMDL"), *available at* http://www.mass.gov/dep/water/resources/neponset.doc.

[10] *See* Charles River Pathogen TMDL at 36-45, *available at* http://www.mass.gov/dep/water/resources/charles1.pdf; Lower Charles River Basin Nutrients TMDL at 46-55, 114, *available at* http://www.mass.gov/dep/water/resources/charlesp.doc; and Neponset River Basin Bacteria TMDL at 17, 30-32, 38, *available at* http://www.mass.gov/dep/water/resources/neponset.doc (citing storm drainage systems as "significant contributors" of bacteria in the Neponset watershed).

[11] The remainder of the area in Boston is served by combined sewers, sanitary sewers, or is open space having no sewers or drains.

control measures, eleven consisted of the continuation of measures that were already in place (most of them without proposed changes). Six of the proposed measures were new programs.

30.     Following the issuance in 1999 of BWSC's Permit, and in response to the Permit's requirement that it implement a representative monitoring program, *see* ¶ 22, *supra*, BWSC commenced a program to monitor stormwater quality in MS4 drainage areas representative of certain land use types throughout the service area. In 2001, BWSC initiated monitoring of three, as opposed to the Permit's requirement of five, selected representative areas: a representative high density residential area in Charlestown (Mount Vernon Street, Drain Manhole 27K397); a representative mixed use area in Hyde Park (Hyde Park Avenue, Drain Manhole 5F208); and a representative open space area in Hyde Park (Wesley G. Ross, Drain Manhole 7G243). BWSC's monitoring of its three selected representative areas documented BWSC discharges in violation of water quality standards as a result of excessive concentrations of bacteria (e. coli and fecal coliform), copper, and zinc. *See, e.g.,* BWSC's 2004 Stormwater Management Report Appendix B, Tables B1-4, B2-4, B3-4 (appended hereto as Exhibit 2). BWSC ceased representative monitoring in 2004.

31.     In response to the Permit's requirement that it implement a program to conduct wet-weather monitoring of receiving waters, *see supra* ¶ 23, BWSC identified three, as opposed to the Permit's requirement of at least four, receiving waters to be monitored. In 2001, it began monitoring of those three receiving waters – Bussey and Canterbury Brooks, in Roslindale, and Chandler Pond, in Brighton. BWSC's monitoring documented violations of several water quality standards – including standards pertaining to bacteria (e. coli and fecal coliform), copper, zinc, and dissolved oxygen – in each of the three receiving waters. *See, e.g.* BWSC's 2006

Stormwater Management Report, Appendix B, Tables B1-3, B1-6, B1-9 (appended hereto as Exhibit 3). BWSC ceased its monitoring of receiving waters in 2006.

32.    In response to the Permit's requirement that it develop and implement a wet-weather screening program for its outfalls, *see* ¶ 24, *supra*, BWSC engaged in limited wet-weather screening activities. BWSC ceased its wet-weather outfall screening at the end of 2000, after screening only twenty-four major outfalls, as opposed to *all* major outfalls, of which currently there are ninety-five.

33.    Starting in 2001, and continuing on an annual basis thereafter, BWSC prepared and submitted to EPA annual Stormwater Management Reports ("Annual Reports"). The Annual Reports documented certain activities conducted by BWSC, including activities addressing ongoing problems with illicit discharges into the MS4.[12] None of BWSC's Annual Reports included estimates of the MS4's cumulative loads of pollutants, nor any assessment of the effectiveness of BWSC's SWMP, including stormwater controls, in relation to pollutant loading trends and pollutant-load reduction.

34.    BWSC has not updated its SWMP to address documented water quality problems or to otherwise ensure effectiveness of the SWMP and stormwater controls and compliance with the CWA.

35.    On October 29, 2004, BWSC's Permit expired. Since that time, BWSC has operated its MS4 under an administrative continuation of the expired 1999 Permit.

36.    In September 2005, EPA engaged an audit of BWSC's MS4. The audit resulted in findings, *inter alia*, that "BWSC does not have authority over various City departments and

---

[12] As used in this Complaint, the term "illicit discharge" is intended to include illegal connections to the MS4, as well as infrastructure deficiencies causing cross-contamination between sewers legally conveying sanitary flows and MS4 sewers which, pursuant to the Permit, are not allowed to convey sanitary waste.

commissions to ensure the permit requirements are met and the storm water program effectively implemented," and that "[i]n most cases, BWSC does not have formal agreements in place to ensure the other City departments and commissions are fulfilling their responsibilities." Municipal Separate Storm Sewer System (MS4) Audit, Boston and Water Sewer Commission and the City of Boston, MA, Sept. 13 – 15, 2005, *prepared by* Science Applications Int'l Corp. *for* EPA Region 1 at 1-2 ("EPA Audit").

37.    The EPA Audit also made several findings that BWSC was deficient in addressing stormwater issues associated with new development and construction activities, and that BWSC was required to take specific actions to correct those deficiencies, including but not limited to improving coordination with other municipal agencies, developing and implementing requirements for the use of appropriate construction-related best management practices, and ensuring adequate inspections of construction sites. *Id.* at 3-4, 9-13.

38.    The EPA Audit also found BWSC to be deficient in expeditiously eliminating two illicit connections to the MS4. Specifically, it found that BWSC had identified two illegal connections in 2000 and 2001 which, as of the time of the audit, BWSC had not taken necessary actions to eliminate. *Id.* at 7. Stating that the Permit "require[s] the elimination of illicit connections as expeditiously as possible," the EPA Audit determined that "BWSC must immediately develop a schedule for correction of the illegal connections at the two sites identified in 2000 and 2001." *Id.* at 7-8. Subsequent annual Stormwater Management Reports submitted by BWSC to EPA indicate numerous other failures to expeditiously eliminate illicit connections.

39.    The EPA and others have engaged in monitoring that reveals significant water quality problems caused by BWSC's MS4, including but not limited to EPA monitoring in July

2008, and May, June, and August of 2009, demonstrating significant exceedances of bacteria (e. coli and enterococcus) and evidence of illicit discharges into and from BWSC's MS4.

**COUNT I**
**VIOLATION OF CLEAN WATER ACT**
***UNLAWFUL DISCHARGES CAUSING OR CONTRIBUTING TO VIOLATION***
***OF WATER QUALITY STANDARDS***

40.    Plaintiff re-alleges and incorporates all of the prior paragraphs, as if fully set forth herein.

41.    Massachusetts and federal regulations establish a number of minimum water quality standards for inland and coastal waters in the Massachusetts region, all incorporated by reference into the Permit. The CWA's regulations prohibit the discharge of pollutants that cause or contribute to the violation of water quality standards. *See supra* ¶ 14. BWSC's Permit specifically prohibits the "discharge of pollutants in quantities that would cause a violation of State water quality standards." Permit at 5 (Part I.B.2.a).

42.    BWSC's representative monitoring program demonstrates that discharges from BWSC's MS4 routinely exceed water quality standards and cause or contribute to the violation of water quality standards. Monitoring data from storm sewer manholes in the three representative areas selected by BWSC demonstrate the following violations:

A.    BWSC's monitoring of its representative high density residential area (Mount Vernon Street, Charlestown, Drain Manhole 27K397) reveal violations of water quality standards for e. coli (June 11, 2001, April 25, 2002, and April 28, 2002); fecal coliform (March 3, 2002, April 25, 2002, and April 28, 2002); dissolved copper (June 2, 2001, June 11, 2001, July 17, 2001, March 3, 2002, April 25, 2002, and April 28, 2002); total copper (June 2, 2001, June 11, 2001, July 17, 2001, and March 3, 2002); dissolved

14

zinc (June 2, 2001, June 11, 2001, and July 17, 2001); and total zinc (June 2, 2001, June 11, 2001, July 17, 2001, March 3, 2002, and April 25, 2002). *See* Exhibit 2 (Table B1-4).

      B.    BWSC's monitoring of its representative open space area (Wesley G. Ross, Hyde Park, Drain Manhole 7G243) reveal violations of water quality standards for e. coli (September 25, 2001, April 25, 2002, April 28, 2002, September 27, 2002, October 16, 2002, and October 26, 2002); fecal coliform (September 25, 2001, April 25, 2002, April 28, 2002, September 27, 2002, October 16, 2002, and October 26, 2002); dissolved copper (April 28, 2002); and dissolved zinc (September 25, 2001). *See id.* (Table B2-4).

      C.    BWSC's monitoring of its representative mixed use area (Hyde Park Avenue, Hyde Park, Drain Manhole 5F208) reveal violations of water quality standards for e. coli (April 11, 2003, April 22, 2003, April 26, 2003, April 26, 2004, May 3, 2004, and July 24, 2004); fecal coliform (April 11, 2003, April 22, 2003, April 26, 2003, April 26, 2004, May 3, 2004, and July 24, 2004); dissolved copper (April 22, 2003, April 26, 2003, April 26, 2004, May 3, 2004, and July 24, 2004); total copper (April 11, 2003); dissolved zinc (April 11, 2003, April 22, 2003, April 26, 2003, April 26, 2004, May 3, 2004, and July 24, 2004); and total zinc (April 11, 2003, April 22, 2003, April 26, 2003, April 26, 2004, May 3, 2004, and July 24, 2004).[13] *See id.* (Table B3-4).

43.    BWSC's monitoring of waters receiving stormwater discharges from its MS4 demonstrates that receiving waters routinely violate water quality standards for pollutants present in stormwater runoff and that BWSC's MS4 is causing or contributing to such violations. Data

---

[13] In addition to the violations enumerated in subparagraphs A., B., and C. of this paragraph, BWSC's representative monitoring data include results that are constrained by detection limits which are higher than applicable water quality standards, meaning that BWSC's monitoring data likely omit additional violations. *See* Exhibit 2.

from the three receiving waters selected by BWSC for its receiving-waters monitoring program demonstrate the following violations:

A.    BWSC's monitoring of Bussey Brook, in Roslindale, reveals violations of water quality standards for e. coli (June 11, 2001, September 21, 2001, April 28, 2002, May 2, 2002, April 11, 2003, April 22, 2003, October 15, 2003, April 23, 2004, April 26, 2004, May 3, 2004, August 31, 2004, September 8, 2004, September 18, 2004, May 7, 2005, May 16, 2005, June 17, 2005, and August 15, 2006); fecal coliform (June 11, 2001, September 21, 2001, April 25, 2002, April 28, 2002, May 2, 2002, April 11, 2003, April 22, 2003, October 15, 2003, April 23, 2004, April 26, 2004, May 3, 2004, August 31, 2004, September 8, 2004, September 18, 2004, May 7, 2005, May 16, 2005, June 17, 2005, and August 15, 2006); dissolved oxygen (April 25, 2002, and September 8, 2004); dissolved copper (June 2, 2001, June 11, 2001, September 21, 2001, April 25, 2002, April 28, 2002, April 22, 2003, April 23, 2004, April 26, 2004, May 3, 2004, August 31, 2004, September 8, 2004, May 7, 2005, May 16, 2005, and June 17, 2005); dissolved zinc (June 2, 2001, June 11, 2001, September 21, 2001, April 25, 2002, April 28, 2002, April 11, 2003, April 22, 2003, April 23, 2004, August 31, 2004, September 8, 2004, September 18, 2004, May 7, 2005, May 16, 2005, and June 17, 2005); and total zinc (June 2, 2001, June 11, 2001, September 21, 2001, April 25, 2002, April 28, 2002, May 2, 2002, and April 22, 2003).  *See* Exhibit 3 (Table B1-3).

B.    BWSC's monitoring of Canterbury Brook, in Roslindale, reveals violations of water quality standards for e. coli (June 11, 2001, September 21, 2001, April 25, 2002, April 28, 2002, May 2, 2002, April 11, 2003, April 22, 2003, October 15, 2003, April 23, 2004, April 26, 2004, May 3, 2004, August 31, 2004, September 8, 2004,

September 18, 2004, May 7, 2005, May 16, 2005, June 17, 2005, August 15, 2006, September 14, 2006, and September 19, 2006); fecal coliform (June 11, 2001, September 21, 2001, April 25, 2002, April 28, 2002, May 2, 2002, April 11, 2003, April 22, 2003, October 15, 2003, April 23, 2004, April 26, 2004, May 3, 2004, August 31, 2004, September 8, 2004, September 18, 2004, May 7, 2005, May 16, 2005, June 17, 2005, August 15, 2006, September 14, 2006, and September 19, 2006); dissolved oxygen (June 2, 2001, June 11, 2001, September 21, 2001, April 25, 2002, September 8, 2004, August 15, 2006, and September 19, 2006); dissolved copper (April 25, 2002, April 28, 2002, May 2, 2002, April 22, 2003, May 3, 2004, August 31, 2004, September 8, 2004, May 7, 2005, May 16, 2005, and June 17, 2005); total copper (April 28, 2002); dissolved zinc (June 2, 2001, June 11, 2001, April 25, 2002, April 28, 2002, April 11, 2003, April 22, 2003, April 23, 2004, May 3, 2004, August 31, 2004, September 8, 2004, September 18, 2004, May 7, 2005, May 16, 2005, and June 17, 2005); and total zinc (April 25, 2002, April 28, 2002, May 2, 2002, April 11, 2003, April 22, 2003, April 23, 2004, May 3, 2004, September 18, 2004, May 7, 2005, May 16, 2005, June 17, 2005, and September 14, 2006). *Id.* (Table B1-9).

C.    BWSC's monitoring of Chandler Pond, in Brighton, reveals violations of water quality standards for e. coli (September 21, 2001, April 22, 2003, September 8, 2004, September 18, 2004, May 16, 2005, June 17, 2005, August 15, 2006, and September 14, 2006); fecal coliform (September 21, 2001, October 15, 2003, April 23, 2004, September 8, 2004, September 18, 2004, May 16, 2005, August 15, 2006, and September 14, 2006); dissolved oxygen (September 21, 2001 and April 25, 2002); and

dissolved zinc (June 2, 2001, June 11, 2001, April 25, 2002, April 11, 2003, August 31, 2004, September 18, 2004, and June 17, 2005).[14]  *Id.* (Table B1-6).

44.    BWSC's monitoring data are representative of conditions elsewhere throughout the MS4.  EPA Draft Permit Fact Sheet at 7 (stating that drainage-area locations "were selected to provide representative data on the quality and quantity of discharges from the MS4 as a whole.").  Therefore, BWSC has violated the prohibition against causing or contributing to the violation of water quality standards not only in the specific areas (and on the specific dates) monitored by BWSC, but in other areas (and other dates) throughout the MS4 as well.  Monitoring of other locations within the MS4, by EPA and others, further demonstrates violations of water quality standards in places other than the representative area and receiving waters monitored by BWSC.

45.    BWSC's data demonstrate that discharges of nutrients and organic matter in BWSC's stormwater runoff has caused or contributed to water quality standards violations by contributing to eutrophication and depressed dissolved oxygen in receiving waters.  *See, e.g.*, Exhibit 2.[15]  *See also* 314 CMR 4.05(5)(c) (establishing nutrients criteria applicable to all surface waters).  Discharges of these pollutants, particularly phosphorus, are causing or contributing to, at a minimum, water quality violations in the Lower Charles River Basin – which is subject to an

---

[14] In addition to the violations enumerated in subparagraphs A., B., and C. of this paragraph, BWSC's receiving-water monitoring data include results that are constrained by detection limits that are greater than the applicable water quality standards.  *See* Exhibit 3.  Accordingly, BWSC's receiving-waters monitoring data likely omit additional violations.

[15]*See also* Table S-5 of Memorandum to Amy Schofield, BWSC, from David M. George, Rizzo Associates, Re: NPDES Storm Water Monitoring Program, Program Summary of Water Quality Data (Oct. 27, 2004), excerpt appended as Exhibit 4 (providing estimates of significant annual pollutant loads of total phosphorus and total nitrogen, including an estimated annual loading average of 7,200 pounds of total phosphorus and 34,020 pounds of total nitrogen from BWSC's storm drain outfalls).

EPA-approved total maximum daily load[16] – as a result of elevated algae levels and low dissolved oxygen. The Lower Charles Nutrients TMDL will require substantial reductions in BWSC's contribution of nutrients to the Lower Charles, both directly, and indirectly through the Stony Brook and Muddy River watersheds.

46.    BWSC's data, and monitoring by EPA and others, demonstrate that discharges from BWSC's MS4 have caused or contributed to violations of water quality standards pertaining to bacteria. Discharges of excessive pathogens and bacteria are causing or contributing to, at a minimum, water quality violations in the Boston Harbor, Boston Inner Harbor, the Chelsea River, and the Mystic River, as well as the Charles and Neponset Rivers, which are subject to EPA-approved total maximum daily loads for bacteria.[17]

47.    BWSC has unlawfully failed to adopt and implement measures and controls required to achieve and ensure compliance with the requirement that its MS4 discharges not cause or contribute to the violation of water quality standards.

48.    BWSC's violations of the prohibition against causing or contributing to the violation of water quality standards have occurred since the effective date of the Permit and continue to occur on an ongoing basis. In light of the BWSC's history of violations, and its failure to take corrective action, BWSC will continue to violate this prohibition in the future unless and until enjoined from doing so.

49.    Each day, and for each pollutant parameter, that BWSC has violated or continues to violate the prohibition against causing or contributing to the violation of water quality

---

[16] *See* Lower Charles River Basin Nutrients TMDL, *supra* note 9.

[17] *See* Charles River Pathogen TMDL, Neponset River Basin Bacteria TMDL, *supra* note 9.

standards, is a separate and distinct violation of the Permit and Sections 301(a) and 402(p) of the CWA, 33 U.S.C. §§ 1311(a) and 1342(p).  CWA § 309(d), 33 U.S.C. § 1319(d).

<u>**COUNT II**</u>
<u>**VIOLATION OF CLEAN WATER ACT**</u>
<u>***UNLAWFUL DISCHARGES OF TOXIC SUBSTANCES IN TOXIC AMOUNTS***</u>

50.    Plaintiff re-alleges and incorporates all of the prior paragraphs, as if fully set forth herein.

51.    BWSC's Permit specifically prohibits the "discharge of toxics in toxic amounts." Permit at 5 (Part I.B.2.a).  *See also* CWA § 101(a)(3), 33 U.S.C. § 1251(a)(3) ("[I]t is the national policy that the discharge of toxic pollutants in toxic amounts be prohibited . . . .").

52.    Copper and zinc are both toxic pollutants and have been identified as such by the EPA. *See* Permit, Part II.E ("'<u>Toxic pollutants</u>' means any pollutant listed as toxic under Section 307(a)(1) [of the CWA] . . . ."); 40 C.F.R. § 401.15 (listing, pursuant to CWA § 307(a)(1), copper and zinc as toxic pollutants).  *See also* 40 C.F.R. Part 423, App. A (listing copper and zinc among U.S. Environmental Protection Agency's priority pollutants).  Discharges that contain copper or zinc in excess of water quality criteria for these toxic metals, or that cause or contribute to violations of such criteria, constitute discharges of toxics in toxic amounts.

53.    BWSC's representative monitoring data demonstrate that BWSC's MS4 has discharged copper and zinc in concentrations that exceed water quality criteria for copper and zinc and, therefore, that BWSC has unlawfully discharged toxics in toxic amounts.  *See* ¶ 42, *supra.*  These data are representative of conditions in other areas within the MS4 and therefore demonstrate that similar violations have occurred and are occurring elsewhere throughout the MS4 system.

54.    BWSC's monitoring of receiving waters demonstrate that BWSC's MS4 has caused or contributed to concentrations of copper and zinc that exceed water quality criteria and, therefore, has unlawfully discharged toxics in toxic amounts.    *See* ¶ 43, *supra*.

55.    BWSC's discharges of copper and zinc in toxic amounts have occurred since the effective date of the Permit and continue to occur.  In light of the BWSC's history of violations, and its failure to take corrective action, BWSC will continue to violate the prohibition against discharging toxics in toxic amounts unless and until enjoined from doing so.

56.    Each day, and for each pollutant parameter, that BWSC has  violated or continues to violate the prohibition against discharging toxics in toxic amounts, is a separate and distinct violation of the Permit and Sections 301(a) and 402(p) of the CWA, 33 U.S.C. §§ 1311(a) and 1342(p).  CWA § 309(d), 33 U.S.C. § 1319(d).

## COUNT III
## VIOLATION OF CLEAN WATER ACT
### *UNLAWFUL DISCHARGES OF VISIBLE OIL SHEEN*

57.    Plaintiff re-alleges and incorporates all of the prior paragraphs, as if fully set forth herein.

58.    BWSC's Permit prohibits the "discharge of either a visible oil sheen, foam, or floating solids, in other than trace amounts."  Permit at 5 (Part I.B.2.a).

59.    Oil and grease concentrations equal to or greater than 10 milligrams per liter are sufficient to cause a visible oil sheen.

60.    BWSC's monitoring data from its representative mixed use site (Hyde Park Avenue, in Hyde Park) demonstrate that BWSC's MS4 has discharged stormwater with concentrations of oil and grease in excess of 10 milligrams (mg) per liter and, therefore, that it has violated the Permit's prohibition of the discharge of a visible oil sheen. *See* Exhibit 2 (Table

B3-4).[18]  These data are representative of discharges from other mixed use areas throughout the MS4 and, therefore, demonstrate that BWSC's MS4 has violated this prohibition elsewhere.

61.    BWSC's violations of the prohibition against the discharge of visible oil sheens have occurred since the issuance of its Permit, and continue to occur.  In light of the BWSC's history of violations, and its failure to take corrective action, BWSC will continue to violate the prohibition the discharge of a visible oil sheen unless and until enjoined from doing so.

62.    Each day that BWSC has violated or continues to violate the Permit's prohibition against discharges of visible oil sheens is a separate and distinct violation of the Permit and Sections 301(a) and 402(p) of the CWA, 33 U.S.C. §§ 1311(a) and 1342(p).  CWA § 309(d), 33 U.S.C. § 1319(d).

## COUNT IV
## VIOLATION OF CLEAN WATER ACT
## *UNLAWFUL ILLICIT DISCHARGES*

63.    Plaintiff re-alleges and incorporates all of the prior paragraphs, as if fully set forth herein.

64.    As required by the CWA, BWSC's Permit expressly does not authorize discharges of non-stormwater from BWSC's MS4.  Permit at 2 (Part I.A.3).  *See also* CWA § 402(p)(3)(B), 33 U.S.C. § 1342(p)(3)(B) (requiring that NPDES permits for MS4s "shall include a requirement to effectively prohibit non-stormwater discharges into the storm sewers . . . .").  The Permit specifically mandates that BWSC implement a program to detect, and eliminate as expeditiously as possible, illicit discharges.  Permit at 7 (Part I.B.2.g.5).

65.    Since the effective date of the Permit, numerous illicit connections to BWSC's MS4 have discharged non-stormwater into BWSC's sewers and caused or contributed to ongoing

---

[18] *See also* Exhibit 3, Tables B1-3, B1-9 (documenting oil and grease concentrations equal to or greater than 10 mg/L.

water quality problems, including ongoing violations of state water quality standards, related to bacteria and nutrients. These illicit connections are not authorized by the Permit and, accordingly, constitute unauthorized discharges in violation of Section 301(a) of the CWA, 33 U.S.C. §1311(a).

66.    Despite significant, ongoing water quality problems caused by illicit connections to its MS4, BWSC has violated requirements pertaining to the expeditious elimination of illicit connections.

67.    BWSC's violations related to illicit discharges are ongoing and will continue in the future unless and until BWSC is enjoined therefrom.

68.    Each day that BWSC has violated or continues to violate the prohibition against non-stormwater discharges, or the requirement that expeditiously eliminate illicit connections to its MS4, is a separate and distinct violation of the Permit and Sections 301(a) and 402(p) of the CWA, 33 U.S.C. §§ 1311(a) and 1342(p).

**COUNT V
VIOLATION OF CLEAN WATER ACT
*FAILURE TO ESTIMATE AND ANALYZE ANNUAL POLLUTANT LOADS***

69.    Plaintiff re-alleges and incorporates all of the prior paragraphs, as if fully set forth herein.

70.    CWA regulations and BWSC's Permit mandate that BWSC estimate annual pollutant loadings from its MS4, review trends in estimated cumulative pollutant loadings as part of its an annual assessment of its SWMP, and revise its SWMP and stormwater controls as necessary in response to those cumulative pollutant load trends and to ensure compliance with the CWA. *See* ¶¶ 16, 25, *supra*.

71.     Starting with submission of its first mandatory annual Stormwater Management Report in 2001, and continuing thereafter, BWSC has failed to annually estimate and assess trends in cumulative pollutant loadings from its MS4 system, has failed to adequately assess the effectiveness of its SWMP and associated stormwater controls and other measures on cumulative pollutant loading, and has failed to address clear indications that its SWMP, stormwater controls and other measures are ineffective.  These failures constitute violations of the Permit and the CWA.

72.     BWSC's violations of the above-referenced requirements are ongoing and continuous and will continue to occur unless and until BWSC is enjoined therefrom.

73.     Each day that the BWSC has violated or continues to violate the above-referenced requirements is a separate and distinct violation of the Permit and Sections 301(a) and 402(p) of the CWA, 33 U.S.C. §§ 1311(a) and 1342(p).

**COUNT VI**
**VIOLATION OF CLEAN WATER ACT**
***FAILURE TO UPDATE STORMWATER MANAGEMENT PLAN***

74.     Plaintiff re-alleges and incorporates all of the prior paragraphs, as if fully set forth herein.

75.     The Permit requires that BWSC's SWMP "shall be updated as necessary to ensure conformance with the requirements of CWA § 402(p)(3)(B)."  Permit at 5 (Part I.B.2.a).  *See also id.* at 3 (Part I.B) ("The storm water pollution prevention and management program requirements of this Part shall be implemented through the SWMP submitted as part of the permit application *and revised as necessary*.") (emphasis added).

76.     Despite significant water quality violations associated with discharges from its MS4, BWSC has not updated its SWMP to satisfy CWA requirements – including but not

24

limited to the requirement that it reduce the discharge of pollutants to the maximum extent practicable – and to incorporate measures or controls necessary to ensure compliance with the Permit's prohibitions against the violation of water quality standards, the discharge of toxics in toxic amounts, and the discharge of visible oil sheen.

77.    BWSC's violations of this requirement are ongoing and continuous and will continue to occur unless and until  BWSC is enjoined therefrom.

78.    Each day that the BWSC has violated or continues to violate the requirement that it update its SWMP to ensure CWA compliance is a separate and distinct violation of the Permit and Sections 301(a) and 402(p) of the CWA, 33 U.S.C. §§ 1311(a) and 1342(p).

**COUNT VII**
**VIOLATION OF CLEAN WATER ACT**
***FAILURE TO SECURE AND EXERCISE AUTHORITY TO CONTROL DISCHARGES***

79.    Plaintiff re-alleges and incorporates all of the prior paragraphs, as if fully set forth herein.

80.    The Permit presupposes that BWSC has, and imposes the requirement that it shall maintain, "legal authority to control discharges to and from those portions of the MS4 which it owns or operates."  Permit at 10 (Part I.B.5).

81.    Since the effective date of the Permit, and until at least September 2005, BWSC did not have, or did not exercise, legal authority over various other City departments and commissions to ensure effective implementation of its SWMP and to ensure compliance with the CWA and its Permit.

82.    Since the effective date of the Permit, and until at least September 2005, BWSC did not have, or did not exercise, legal authority to control discharges to its MS4 from other municipal entities, including the City of Brookline.

83.     BWSC's violations of the Permit's legal-authority requirement are ongoing and continuous.  BWSC will continue to violate this requirement in the future unless and until enjoined from doing so.

84.     Each day that BWSC has violated or continues to violate the Permit's legal-authority requirement is a separate and distinct violation of the Permit and Sections 301(a) and 402(p) of the CWA, 33 U.S.C. §§ 1311(a) and 1342(p).

## COUNT VIII
## VIOLATION OF CLEAN WATER ACT
### *FAILURE TO ADEQUATELY COORDINATE WITH OTHER ENTITIES*

85.     Plaintiff re-alleges and incorporates all of the prior paragraphs, as if fully set forth herein.

86.     BWSC, as the permittee, is responsible for ensuring implementation and compliance with the requirements of its Permit.  To prevent duplicative efforts, but subject to the requirement of Permit compliance, both the Permit and the CWA regulations allow for and contemplate close coordination with other agencies and entities.  *See, e.g.,* Permit at 3 (Part I.B); *id.* at 10 (Part I.B.4).  *See also* 40 C.F.R. § 122.26(d)(2)(iv).

87.     Since the effective date of the Permit, and until at least September 2005, BWSC failed to adequately coordinate with other agencies or entities to ensure effective implementation of the SWMP and compliance with the Permit and CWA.  Such inadequate coordination includes, but is not limited to, failures to ensure sufficient notice to building permit applicants of their responsibilities under the NPDES permitting program, to ensure sufficient regulation and inspection of development and re-development activities (both during and after construction), and to ensure, where necessary, appropriate enforcement action.

88.     BWSC's failure to adequately coordinate with other agencies and entities is ongoing and continuous and will continue absent appropriate injunctive relief.

89.     Each day that BWSC has failed, or continues to fail, to adequately coordinate with other agencies and entities to ensure proper and effective implementation of its SWMP, is a separate and distinct violation of the Permit and Sections 301(a) and 402(p) of the CWA, 33 U.S.C. §§ 1311(a) and 1342(p).

**COUNT IX**
**VIOLATION OF CLEAN WATER ACT**
*VIOLATION OF REPRESENTATIVE-MONITORING REQUIREMENTS*

90.     Plaintiff re-alleges and incorporates all of the prior paragraphs, as if fully set forth herein.

91.      The Permit requires BWSC to implement a wet weather monitoring program "to provide data necessary to assess the effectiveness and adequacy of control measures implemented under the SWMP."  Permit at 13 (Part I.C.1).

92.     As part of this wet weather monitoring program, the Permit requires that BWSC "shall monitor a minimum of five (5) representative drainage areas to characterize the quality of storm water discharges from the MS4."  *Id.* at 14 (Part I.C.1.a).

93.     Subsequent to the effective date of the Permit, BWSC monitored only three representative drainage areas, violating the Permit requirement that it monitor at least five representative drainage areas.

94.     BWSC's violation of the Permit's requirement that it monitor a minimum of five representative drainage areas has occurred since the inception of its representative monitoring program and on an ongoing, continuous basis and, absent appropriate injunctive relief, will continue into the future.

95.     Each day that BWSC has violated or continues to violate the Permit's requirement that it implement a program to monitor five representative drainage areas is a separate and distinct violation of the Permit and Sections 301(a) and 402(p) of the CWA, 33 U.S.C. §§ 1311(a) and 1342(p).

### COUNT X
### VIOLATION OF CLEAN WATER ACT
### *VIOLATION OF RECEIVING-WATER MONITORING REQUIREMENTS*

96.     Plaintiff re-alleges and incorporates all of the prior paragraphs, as if fully set forth herein.

97.     The Permit requires BWSC to implement a wet weather monitoring program "to provide data necessary to assess the effectiveness and adequacy of control measures implemented under the SWMP." Permit at 13 (Part I.C.1).

98.     As part of this wet weather monitoring program, the Permit requires that BWSC monitor "a minimum of four (4) receiving waters three (3) times a year throughout the permit term . . . ." *Id.* at 14 (Part I.C.1.b).

99.     Contrary to the Permit's requirement that it monitor a minimum of four receiving waters, BWSC has monitored only *three* receiving waters.

100.    Subsequent to its 2006 monitoring, BWSC terminated its monitoring of receiving waters altogether, violating the requirement that it conduct such monitoring throughout the permit term.

101.    BWSC's violation of the Permit's requirement that it monitor a minimum of four receiving waters has occurred since the inception of BWSC's monitoring program and on a continuing basis. Its violation of the requirement that it monitor receiving waters throughout the

Permit term has occurred since BWSC ceased such monitoring in 2006 and, since that time, on a continuing basis.  Absent appropriate injunctive relief, these violations will continue.

102.    Each day that BWSC has violated, or continues to violate, the Permit's requirements relative to receiving-waters monitoring is a separate and distinct violation of the Permit and Sections 301(a) and 402(p) of the CWA, 33 U.S.C. §§ 1311(a) and 1342(p).

## COUNT XI
## VIOLATION OF CLEAN WATER ACT
### *VIOLATION OF OUTFALL-SCREENING REQUIREMENTS*

103.    Plaintiff re-alleges and incorporates all of the prior paragraphs, as if fully set forth herein.

104.    BWSC's Permit requires that it "develop and implement a program to identify, investigate, and address areas within [BWSC's] jurisdiction that may be contributing to excessive levels of pollutants to the MS4 as a result of rainfall or snow melt," and that as part of this program it shall, at a minimum, "screen *all* major outfalls at least once during the permit term" and record and summarize certain enumerated data from such screening.  Permit at 16 - 17 (Part I.C.6) (emphasis added).

105.    BWSC discontinued the wet weather outfall screening at the end of 2000, after screening only twenty-four major outfalls.  According to its most recent Stormwater Management Report (2008), BWSC's MS4 includes 95 major outfalls.

106.    BWSC has violated the Permit's wet weather outfall screening requirements.

107.    BWSC's violations of the Permit's wet weather outfall screening requirements are ongoing and continuous and, absent appropriate injunctive relief, will continue into the future.

108.    Each day that BWSC has violated, or continues to violate, the Permit's wet weather outfall screening requirements constitutes a separate and distinct violation of the Permit and Sections 301(a) and 402(p) of the CWA, 33 U.S.C. §§ 1311(a) and 1342(p).

**COUNT XII**
**VIOLATION OF CLEAN WATER ACT**
***FAILURE TO REDUCE POLLUTANTS TO THE MAXIMUM EXTENT PRACTICABLE***

109.    Plaintiff re-alleges and incorporates all of the prior paragraphs, as if fully set forth herein.

110.    The CWA requires controls and measures to reduce the discharge of pollutants from MS4s to the maximum extent practicable.  33 U.S.C. § 1342(p)(3)(B)(iii).  BWSC's Permit requires that it "develop and implement a storm water pollution prevention and management program designed to reduce, to the maximum extent practicable, the discharge of pollutants from the Municipal Separate Storm Sewer System."  Permit at 3 (Part I.B).

111.    Since the effective date of its Permit, and as evidenced by significant water quality problems and programmatic failures, including but not limited to the failure to adopt and implement effective stormwater controls and best management practices, BWSC has violated the mandate of the CWA and its Permit that it reduce the discharge of pollutants from its MS4 to the maximum extent practicable.

112.    BWSC's failure to reduce the discharge of pollutants to the maximum extent practicable is ongoing and continuous and will continue to occur absent appropriate injunctive relief.

113.    Each day that BWSC has violated or continues to violate the requirement that it reduce the discharge of pollutants to the maximum extent practicable is a separate and distinct

violation of the Permit and Sections 301(a) and 402(p) of the CWA, 33 U.S.C. §§ 1311(a) and 1342(p).

## PRAYER FOR RELIEF

Plaintiff respectfully requests that this Court grant the following relief:

A.    Issue a declaratory judgment, pursuant to 28 U.S.C. § 2201, that Defendants have violated and remain in violation of BWSC's Permit, Sections 301(a) and 402(p) of the CWA, 33 U.S.C. §§ 1311(a) and 1342(p), and applicable regulations, as alleged in each of the counts set forth in this Complaint;

B.    Enjoin Defendants from violating the requirements of the Permit, Sections 301(a) and 402(p) of the CWA, 33 U.S.C. §§ 1311(a) and 1342(p), and applicable regulations;

C.    Impose civil penalties on Defendants as provided under Sections 505(a) and 309(d) of the CWA, 33 U.S.C. §§ 1365(a) and 1319(d), and its implementing regulations of 40 C.F.R. § 19.4;

D.    Award Plaintiff its costs of litigation, including reasonable attorney and expert witness fees, as provided under Section 505(a) of the CWA, 33 U.S.C. § 1365(d); and

E.    Grant such other relief as this Court may deem appropriate.

Respectfully submitted,

CONSERVATION LAW FOUNDATION, INC.

By its attorneys,

/s/ Peter Shelley
Peter Shelley
BBO No. 544334
Conservation Law Foundation, Inc.
62 Summer Street
Boston, MA 02110
(617) 350-0990
pshelley@clf.org


/s/ Christopher M. Kilian
Christopher M. Kilian[19]
Vermont Bar License No. 2680
Conservation Law Foundation, Inc.
15 East State Street, Suite 4
Montpelier, VT 05602
(802) 223-5992
ckilian@clf.org


/s/ Thomas F. Irwin
Thomas F. Irwin[20]
New Hampshire Bar I.D. No. 11302
Conservation Law Foundation, Inc.
27 North Main Street
Concord, NH 03301
(603) 225-3060
tirwin@clf.org


Dated: February 12, 2010

---

[19] Pursuant to Local Rule 83.53, a motion for the admission of Attorney Christopher Kilian *pro hac vice* is this day being filed by Attorney Peter Shelley.

[20] Pursuant to Local Rule 83.53, a motion for the admission of Attorney Thomas Irwin *pro hac vice* is this day being filed by Attorney Peter Shelley.