UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| CONSERVATION LAW FOUNDATION, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:10-cv-10250-RGS |
| | ) | |
| BOSTON WATER AND SEWER | ) | |
| COMMISSION, et al. | ) | |
| Defendants. | ) | |
| _____ | ) | |

MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR
PARTIAL SUMMARY JUDGMENT

Introduction

Conservation Law Foundation has initiated this Clean Water Act (CWA) citizen suit

because Boston Water & Sewer Commission's (BWSC's) chronic violations of its National

Pollutant Discharge Elimination System (NPDES) permit frustrate the broader efforts to restore

all Boston-area waters to health.  Other entities that have failed to uphold CWA obligations have

been and are being held accountable for degrading Boston Harbor and its tributaries.

Meanwhile, BWSC—through its own signed and certified annual "Stormwater Management

Reports"—continues to evince complacency even as these reports document the unlawful

contribution of BWSC's municipal separate storm sewer system (MS4) to urban water woes.

Consistent with Boston Harbor's sad pollution past, state and federal regulators have

been slow to hold this Boston Harbor polluter accountable under the CWA.  In light of BWSC's

binding admissions and other undisputed facts presented by CLF in support of this motion, the

responsibility of assigning BWSC its due liability for widespread NPDES violations falls to the

Court playing its congressionally-designated role under the CWA citizen suit provisions.  By

fulfilling this important role in the CWA, the Court will help fit yet another piece of the Boston

1

area's clean water puzzle into place, bringing Boston's waters ever closer to the national goal of "water quality which provides for the protection and propagation of fish, shellfish, and wildlife and provides for recreation in and on the water".[1]

## Summary of the Argument

BWSC has admitted that it has violated and continues to violate numerous interrelated requirements and prohibitions contained in its CWA permit.  Since the permit's inception, BWSC's own signed and certified annual "Stormwater Management Reports" containing its monitoring data have catalogued BWSC's continuing system-wide permit violations.  They also catalogue BWSC's continuing failure to halt and correct the water quality violations caused by unlawfully polluted discharges from its MS4.  As required by the Permit, BWSC certified the accuracy of monitoring and annual reports in which it compiled the admissions of its numerous violations.  As a matter of law, the admissions contained in such reports conclusively establish BWSC's liability under the CWA's NPDES permitting program.

When those reports indicated BWSC's failure to comply, as they have year after year, the permit compels BWSC to undertake additional remedial measures commensurate with problems indicated by water quality data.  Yet; year after year, BWSC's reports instead documented BWSC's failure to undertake corrective measures necessary to correct the water quality problems its own monitoring documented.

Specifically, BWSC's admissions and other undisputed facts in the record show that:

- BWSC's over-polluted MS4 discharges violate the Permit's prohibition on causing water quality standards violations;

---

[1] 33 U.S.C. § 1251(a)(2).

- BWSC's over-polluted MS4 discharges contain concentrations of the toxic metals copper and zinc that exceeded EPA criteria, thus violating the Permit's prohibition against discharges of toxics in toxic amounts;

- BWSC has not updated and revised its Storm Water Management Program as necessary to prevent and correct unlawful bacterial and toxic metals pollution; and

- BWSC is violating monitoring and screening requirements in the Permit.

Even when viewed in the light most favorable to BWSC, its own data stand as conclusive admissions of CWA permit violations by a governmental polluter with a manifestly-inadequate pollution control program that is unlawfully frozen in time. Accordingly, CLF is entitled to partial summary judgment on the issues of liability raised by this motion.

Regulatory Background--The Clean Water Act

Recognizing that clean water is the fundamental building block of life and the foundation of a healthy and prosperous society, Congress passed the modern CWA to restore and protect our nation's polluted waters. The law's ultimate goal is to "eliminate" the "discharge of pollutants" into the nation's waters. 33 U.S.C. § 1251(a)(1). As an interim goal, the law is designed to attain "water quality which provides for the protection and propagation of fish, shellfish, and wildlife and provides for recreation in and on the water" often referred to in shorthand as water that is "fishable and swimmable." Id. § 1251(a)(2); Nat. Res. Def. Council v. EPA, 915 F. 2d 1314, 1317 (9th Cir. 1990) (stating the "[s]tatutory goal" of the CWA is "fishable, swimmable" water).

The CWA prohibits the "discharge of a pollutant"[2] by "any person"[3] from any "point source"[4]

---

[2] "Discharge of a pollutant" means "any addition of any pollutant to navigable waters from any point source." 33 U.S.C. § 1362(12)(A); 40 C.F.R. § 122.2 (stating that this definition "includes additions of pollutants into waters of the United States from: surface runoff which is collected or channeled by man.").
[3] The term "person" includes "commission, or political subdivision of a State." Id. §1362 (5).

into waters of the United States except when the discharge is authorized pursuant to a NPDES permit. 33 U.S.C. § 1311(a). Hence, the EPA and the states "primarily advance[] the Act's objectives-including the ambitious goal that water pollution be not only reduced, but eliminated,…through the use of NPDES permits that, while authorizing some water pollution, place important restrictions on the quality and character of that licit pollution." Waterkeeper Alliance, Inc. v. United States E.P.A., 399 F.3d 486, 491 (2d Cir. 2005). MS4s like the one operated by BWSC are point sources subject to NPDES permitting. 33 U.S.C. § 1342(p)(3)(B). "Any permit noncompliance constitutes a violation of the Clean Water Act and is grounds for enforcement action." 40 C.F.R. § 122.41(a).

To complement NPDES permitting, the CWA directs each state to establish minimum "water quality standards" sufficient to carry out the overall purpose of the Act. 33 U.S.C. § 1313; 40 C.F.R. § 131.2. These standards define a state's water quality goals by "designating the use or uses to be made of the water and by setting criteria necessary to protect those uses." 40 C.F.R. § 131.2. These standards also shape permitting requirements for all sources, including MS4s. 40 C.F.R. § 122.4(d) (NPDES permits may only be issued when the imposition of permit conditions can ensure compliance with water quality standards); id. § 122.44(d) (requiring that NPDES permits include conditions to prevent discharges from causing or contributing to exceedances of water quality standards).

Massachusetts has adopted numerous water quality standards and criteria that are applicable to the Class B and Class SB waters into which BWSC's MS4 discharges. 314 CMR 4.05 (4)(b) (Class CB); 314 CMR 4.05(3)(b) (Class B).

Stormwater Pollution in Massachusetts

---

[4] "Point source" "means any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit…from which a pollutant is or may be discharged." Id. § 1362(14).

In Massachusetts, stormwater runoff "represents the single largest source responsible for water quality impairments in the Commonwealth's rivers, lakes, ponds, and marine waters."[5] Improperly controlled stormwater discharges threaten Massachusetts' water supply, fisheries, wildlife habitat preservation, groundwater supply and flood control ability.[6]  Stormwater pollution is contributing to significant problems plaguing water bodies in urbanized eastern Massachusetts, including the degradation of numerous water bodies into which BWSC's MS4 discharges its stormwater pollution.  These include but are not limited to the Charles, Chelsea, Mystic, and Neponset Rivers, and Boston Harbor, each of which is listed by Massachusetts as impaired because of chronic exceedances of state water quality standards for pollutants (in many cases numerous pollutants) associated with discharges from separate storm sewer systems.[7]

## Argument

### I.     BWSC'S MS4 DISCHARGES UNLAWFULLY VIOLATE WATER QUALITY STANDARDS

#### A.   *BWSC's Permit Incorporates the Clean Water Act's Prohibition on Discharges that Cause or Contribute to a Violation of State Water Quality Standards*

EPA, as permit issuer, must impose permit conditions that "ensure compliance" with state water quality standards such as those adopted by the state of Massachusetts.  40 C.F.R. § 122.4(d).  Permits must, therefore, contain any requirements "necessary to achieve water quality standards" through "limitations" on pollutants or pollutant parameters that would cause or contribute to a violation of State water quality standards.  40 C.F.R. § 122.44(d); see also (Ex. B at 5 (citing 40 C.F.R. § 122.44(d)).

---

[5] Massachusetts Department of Environmental Protection ("DEP"), Massachusetts Stormwater Handbook, Volume 1, Ch.1: The Stormwater Management Standards, February 2008 *available at*:
http://www.mass.gov/dep/water/laws/policies.htm
[6] Id. Ch. 2: Legal Framework for Stormwater Management.
[7] Massachusetts Year 2008 Integrated List of Waters, Final Listing of the Condition of Massachusetts' Waters Pursuant to Sections 303(d) and 305(b) of the Clean Water Act (Dec. 2008). *available at*:
http://www.mass.gov/dep/water/resources/tmdls.htm

In compliance with these CWA requirements, EPA included the following condition in BWSC's MS4 permit: "[t]he permittee shall select measures or controls to satisfy the following water quality prohibitions:…<u>No discharge of pollutants in quantities that would cause a violation of State water quality standards.</u>" Facts ¶10.[8]  EPA amplified this prohibition in the "Fact Sheet"[9] accompanying BWSC's permit, stating unequivocally that "MS4s are required to achieve compliance with Water Quality Standards" as a statutory requirement under CWA sections 402(p)(3)(B)(iii)[10] and 301(b)(1)(C).[11] Facts ¶11[12].  EPA explained further that BWSC should "explore opportunities for pollution prevention measures, while reserving the more costly structural controls for higher priority watersheds or where pollution prevention measures prove unfeasible or ineffective in achieving water quality standards."  Facts ¶12.

The Class B and Class SB water quality standards assigned to Boston Harbor and the twenty-six Boston-area waterways receiving BWSC's stormwater discharges are set at levels necessary to protect swimming, boating, shellfish harvesting, and aquatic life. Ex. B at 4 ¶ 5 The express terms of BWSC's permit, as explained and amplified by its accompanying Fact Sheet, notified BWSC of its obligation to comply with these EPA-approved Massachusetts water quality standards.  As the admissions and undisputed facts set forth below demonstrate, BWSC has violated and continues to violate this central permit requirement.

---

[8] All citations to "Fact" refer to paragraphs in Plaintiff's LOCAL RULE 56.1 STATMEMENT OF UNDISPUTED FACTS ACCOMPANYING MOTION FOR PARTIAL SUMMARY JUDGMENT.

[9] CWA regulations require EPA to issue a "Fact Sheet" briefly setting forth "the principal facts and the significant factual, legal, methodological and policy questions considered in preparing the draft permit." 40 C.F.R. § 124.8. Upon issuance of the final permit, the Fact Sheet becomes part of the Administrative Record. <u>Id</u>. § 124.18(b).

[10] Codified at 33 U.S.C. § 1342(p)(3)(B)(iii) (mandating that MS4 permits "shall require controls to reduce the discharge of pollutants to the maximum extent practicable…and other such provisions as the Administrator or the State determines appropriate for the control of such pollutants")

[11] Codified at 33 U.S.C. § 1311(b)(1)(C) (mandating that all N.P.D.E.S. permits issued after July 1, 1977 include "any more stringent limitation…necessary to meet water quality standards.").

[12].EPA observed further that all the waters receiving discharges from BWSC's permitted MS4 "are classified according to state water quality standards as Class B, Bcso, SB, and SBcso water bodies." Ex. B at 4.  Accordingly, EPA emphasized that "[d]espite variance conditions and CSO designation, storm water discharges shall achieve compliance with Class B and Class SB standards." <u>Id</u>.

B. *BWSC's Annual Reports Are Binding Admissions of Ongoing Water Quality Standards Violation*

Data and information contained in reports required by NPDES permits "constitute admissions of noncompliance that bind the defendant in an enforcement proceeding." Sierra Club v. Honolulu, 2008 WL 3850495, at *8 n.3 (D.Hawai'i); accord Sierra Club v. Union Oil Co. of Cal., 813 F.2d 1480, 1492 (9th Cir.1987)[13] (holding that defendant's data monitoring reports are "conclusive evidence of exceedance of a permit limit" and recognizing support for this rule in CWA legislative history)[14]; U.S. v. Murphy Oil USA, Inc. 143 F. Supp.2d 1054, 1111 -1112 (W.D.Wis. 2001) (collecting cases). Consistent with federal regulations, BWSC's permit requires it to submit an annual report to EPA that includes the results of its required monitoring program and additional information about BWSC's pollution control activities. Facts ¶ 17-18; 40 C.F.R. § 122.42(c)(1) (requiring annual reporting by MS4 permittees). The annual reports and the monitoring data they include are integral to the enforcement process. National Pollutant Discharge Elimination System Permit Application Regulations for Storm Water Discharges, 55 Fed. Reg. 47,990, 48,059 ("The reports will be used by the permitting authority to aid in evaluating compliance with permit conditions and where necessary, modify permit conditions to address changed conditions."); accord Union Oil Co. of Cal., 813 F.2d at 1492. ("The NPDES program fundamentally relies on self-monitoring."). To ensure the accuracy of these reports, EPA regulations require a public agency's chief executive officer or other duly authorized representative to sign the reports, certifying their accuracy under penalty of law. 40 C.F.R. § 122.22(b), (d). BWSC's permit incorporates these signature and certification requirements.

---

[13] vac'd on other grounds, 485 U.S. 931 (1988), judgment reinstated and amended, 853 F.2d 667 (9th Cir.1988).

[14] [T]he bill ... establishes and makes precise new requirements imposed on persons and subject to enforcement. One purpose of these new requirements is to avoid the necessity of lengthy fact finding, investigations, and negotiations at the time of enforcement. Enforcement of violations of requirements under this Act should be based on relatively narrow fact situations requiring a minimum of discretionary decision making or delay.
S.Rep. No. 414, 92nd Cong., 1st Sess. 64, reprinted in 1972 U.S.Code Cong. & Ad.News 3668, 3730.

Facts ¶18.  Thus, in this enforcement proceeding, BWSC cannot dispute the violations that it has

admitted through its own reports.

> 1.  *BWSC's "Representative Stormwater Monitoring" data are admissions that*
>     *Discharges from BWSC's MS4 "Consistently Exceed Applicable Water Quality*
>     *Standards."*

The Annual "Stormwater Management Reports" BWSC submitted and certified as

accurate to EPA under penalty of perjury reflect the results of monitoring required by the permit.

E.g., Facts¶¶ 18,20, 21.  In particular, each report contains a section on "Representative

Stormwater Monitoring."  Id. ¶21; Ex.B at 8 ¶1 ("Results from the monitoring program will be

submitted annually with the annual report.").  The purpose of "representative monitoring" under

the permit is "to provide representative data on the quality of discharges from the MS4 as a

whole."  Facts ¶14; Ex. B. at 8 (acknowledging that "[t]he monitoring of the discharge of

representative outfalls during actual storm events will provide information on the quality of

runoff from the MS4"); Facts ¶16 (BWSC "admits that the monitoring locations were selected to

provide representative data"); 40 C.F.R. § 122.41(j) ("Samples and measurements taken for the

purpose of monitoring shall be representative of the monitored activity.").  Thus, where the data

and analysis of representative monitoring annually reported to EPA by BWSC show numerous

and consistent violations of water quality standards by the monitored discharges—specifically

for bacteria and toxic metals—they indicate or *represent* violations across the entire MS4.

Between and including 2004 and 2009 BWSC's annual certified reports include a summary

of "general conclusions" made "[b]ased on the data generated under the representative

stormwater monitoring programs."  Facts ¶¶21,22.  Even in the light most favorable to

defendants, this summary and the data on which it relies compel a further conclusion that BWSC

is liable for violating the CWA prohibition on "discharge of pollutants in quantities that would

cause a violation of State water quality standards."

> Bacterial levels in stormwater <u>consistently exceed applicable water quality</u>
> <u>standards</u>, particularly those based on fecal coliform concentration, even
> in areas known to have no illegal sanitary connections….
>
> Levels of copper and zinc in runoff from the Boston area <u>consistently</u>
> <u>exceed applicable water quality criteria, particularly in dissolved form</u>.
> The fact that the metals occur primarily in dissolved form, suggests that
> conventional BMPs aimed at solids control will be ineffective at
> addressing metals toxicity. Data from the mixed use area indicate higher
> metals concentrations and higher proportions of dissolved metal in runoff
> than are reported in the national database….[15]

These narrative conclusions derive from data tables aggregating the underlying representative

monitoring data.  Through "shaded" formatting, the tables highlight the discharge-sampling

events where BWSC documented its own violations.  Facts ¶22 (noting that "shaded values

exceed applicable water quality standards/criteria.").

    In addition, BWSC adopted and certified the foregoing data and conclusions from an

October 28, 2004 "Program Summary of Water Quality Data" prepared by BWSC's consultants.

Facts ¶23.  The "Program Summary," that BWSC submitted to EPA further details BWSC's

failure to "select measures or controls to satisfy the [permit's] water quality prohibition" of

"discharge of pollutants in quantities that would cause a violation of State water quality

standards."  The "Program Summary" concludes as follows:

> I.I.I Bacteria
> Concentrations of fecal coliform exceed Class B standards in 91 percent of the
> storm drain samples collected in the NPDES program.  When these data are
> combined with the storm drain sampling collected during the previous RSM and
> CSM[16] monitoring programs, the frequency of exceedance is more than 95
> percent.  The less stringent boating standard was exceeded in 75 percent of the
> samples.

---

[15] Facts ¶ 21. (Emphasis added).
[16] The "CSM" and "RSM" reference  residential and commercial monitoring conducted by BWSC prior to the
issuance of its NPDES permit.

...
Concentrations of E. Coli similarly exceeded the bathing beach standard in 87 percent of the runoff samples collected under this program, and in 90 percent of the samples when the RSM data are included.

…

1.2.3 Toxic Metals

Dissolved copper exceeded fresh water criterion for acute exposure in 92 percent of the runoff samples taken in the Commission's stormwater monitoring programs (including CSM and RSM), and dissolved zinc concentrations exceeded the criterion in 100 percent of the runoff samples.  Exceedances of the total metals criteria were less frequent, at 30 percent for total copper and 87 percent for total zinc.[17]

BWSC's own "representative" data and analysis of that data compels the undisputable conclusion that BWSC violated its permit by allowing its MS4 to discharge pollutants at levels well in excess of applicable water quality standards.  Moreover, although BWSC abandoned its monitoring efforts in 2004,[18] it has admitted that the prior data are still representative of its systemwide discharges given that BWSC has not undertaken any enhanced pollution control measures since conclusion of the program.  Facts ¶¶40-41.  Noting that the data generated by BWSC's monitoring were similar to previous monitoring efforts and monitoring of water quality contained in a national database, the "Program Summary" states that the data "do not provide any new insight into sources of stormwater pollution and possible control measures."  Facts ¶24.  The "Program Summary" states further that "[i]t is anticipated that there is little to be gained by additional stormwater and receiving water monitoring in the Commission's service area, and that the expense of continuing the program is not justified."  Id.  In other words, BWSC already knew its 204-pipe MS4 was discharging pollutants at levels that exceeded water quality standards, thus violating its permit, and that BWSC did not expect that to change.  Accordingly, BWSC has

---

[17] Facts ¶ 23.

[18] As explained in the following sections, BWSC's failure to continue its monitoring efforts amounts to a separate, ongoing violation of its permit.

conceded that its system continues to discharge at levels that are at least as polluted as those

documented during the prematurely-ended life of its representative monitoring program.

> 2. *BWSC's "Receiving Water Monitoring" Data are Admissions that Discharges from BWSC's MS4 "Consistently Exceed Applicable Water Quality Standards."*

BWSC also filed certified results of its receiving water monitoring to track the fate of

rivers, streams, and ponds that received their polluted discharges.  Here again, BWSC's own data

show numerous violations of water quality standards as summarized in the "Program Summary":

> Levels of dissolved metals (copper and zinc) measured by the monitoring program consistently exceeded applicable water quality criteria in both the upstream and downstream wet weather samples collected in Bussey Brook.  The dissolved copper criterion was exceeded in 73 percent of the samples taken at the upstream station and 60 percent of the samples from the downstream station, while dissolved zinc levels exceeded the applicable criterion in 60 percent of the upstream samples and 67 percent of the downstream samples.[19]

Similarly, BWSC reported that "Bacterial levels in Bussey Brook consistently exceeded

applicable water quality standards in both wet and dry weather as well, with concentrations in the

tens of thousands." Facts ¶ 27 (stating specific percentage downstream exceedances during wet

weather of 71 percent for E. Coli and 93 percent for fecal coliform).

Results from Chandler Pond in Brighton showed exceedances of the dissolved zinc

criterion in 33 percent of wet weather samples, with no exceedances measured in dry weather.

Facts ¶28.  Twenty-six percent of the wet weather samples from this 12-acre pond indicated

violations of the *E. Coli* standard as compared to none during dry weather.  Id.

Sampling from Canterbury Brook in Roslindale indicated a similarly sad situation:

"Concentrations of *E. Coli* exceeded bathing beach standards in…100 percent of the downstream

wet weather samples."  Facts ¶29.  The Brook's water quality also violated the toxic metals

---

[19] Facts ¶ 26. BWSC notes that "[t]he frequency of exceedances may in fact have been higher, but the detection limits used in a number of the laboratory analyses were higher than the water quality criteria." Facts ¶ 26.

criterion for dissolved copper in 33 percent of the samples collected, although here again BWSC admits that flaws in the sampling protocols may have resulted in underreporting of exceedances. Samples also exceeded standards for dissolved zinc with 67 percent exceedance upstream compared to 73 percent downstream.  Facts ¶30.

Though it may have failed to comply with numerous of its MS4 permit requirements, BWSC complied with the continuing requirement to report the results of its representative and receiving water monitoring programs.  Through its certification of the data and analysis contained in those reports, BWSC has conclusively established its own liability for failing to control pollutants in stormwater discharged from its MS4 to ensure that discharges did not exceed water quality standards.  In the face of its reports, BWSC cannot escape liability for its past and continuing discharges that exceed applicable Massachusetts water quality standards established to safeguard swimmers, boaters, shellfish harvesters, and aquatic organisms.

## II.   BWSC'S MS4 UNLAWFULLY DISCHARGES TOXIC METALS IN TOXIC AMOUNTS

BWSC has admitted through its own data and certified annual reports that "Levels of copper and zinc in runoff from the Boston area consistently exceed applicable water quality criteria, particularly in dissolved form."  Facts ¶¶21-22.  Copper and zinc are both toxic pollutants for purposes of the CWA and Defendant's permit.  Ex. A Part II.E ("'Toxic pollutants' means any pollutant listed as toxic under Section 307(a)(1) [of the CWA] . . . ."); 40 C.F.R. § 401.15 (listing, pursuant to CWA § 307(a)(1), copper and zinc as toxic pollutants)[20].  *See also* 40 C.F.R. Part 423, App. A (120), (128) (listing copper and zinc among the EPA's priority

---

[20] "Toxic pollutant" is defined in 33 U.S.C. § 1362(13) (1976) to mean "those pollutants, or combinations of pollutants, including disease- causing agents, which after discharge and upon exposure, ingestion, inhalation or assimilation into any organism, either directly from the environment or indirectly by ingestion through food chains, will, on the basis of information available to the Administrator, cause death, disease, behavioral abnormalities, cancer, genetic mutations, physiological malfunctions (including malfunctions in reproduction) or physical deformations, in such organism."

pollutants).  BWSC's Permit specifically prohibits the "discharge of toxics in toxic amounts."

Facts ¶ 10 ("The permittee shall select measures or controls to satisfy the following water quality

prohibitions: <u>No discharge of toxics in toxic amounts</u>" (emphasis in original)); *see also* 33

U.S.C. § 1251(a)(3) ("[I]t is the national policy that the discharge of toxic pollutants in toxic

amounts be prohibited . . . .").  Thus, as is explained further below, BWSC's factual admission

conclusively establishes that Defendant's MS4 discharges "consistently" violate its permit's

restrictions on toxic metals pollution.  *See* <u>Union Oil Co. of Cal.</u>, 813 F.2d at 1492 (holding that

defendant's data monitoring reports are "conclusive evidence of exceedance of a permit limit").

In the 1987 CWA amendments, Congress mandated that EPA develop and the States,

adopt numeric criteria for toxic pollutants to give meaning to the narrative prohibition on

discharging "toxics in toxic amounts."  33 U.S.C. § 1313(c)(2)(B)[21]; EPA *Water Quality*

*Standards Handbook*, Ch. 3 at 3-1 (Aug. 15, 1994) ("EPA's water quality criteria documents are

available to assist States in: 'interpreting existing water quality standards that include narrative

'no toxics in toxic amounts criteria' ").  Pursuant to this mandate, EPA has published numeric

toxicity criteria for fresh and saltwater concentrations of numerous toxic pollutants, including

copper and zinc.  Massachusetts incorporated these criteria into the State's EPA-approved Water

Quality Standards at 314 CMR § 4.05(5)(e); thus, they have the force of law.  Specifically,

subsection (5)(e) "<u>Toxic Pollutants</u>" states:

---

[21] EPA summarized the legislative history as follows:

> Additional impetus to the water quality standards program occurred on February 4, 1987, when Congress enacted the Water Quality Act of 1987 (Pub. L. 1004). Congressional impatience with the lack of progress in State adoption of standards for toxics (which had been a national program priority since the early 1980's) resulted in the 1987 adoption of new water quality standard provisions in the Water Quality Act amendments. These amendments reflected Congress' conclusion that toxic pollutants in water are one of the most pressing water pollution problems. One concern Congress had was that States were relying, for the most part, on narrative criteria to control toxics (e.g. "no toxics in toxic amounts"), which made development of effluent limitations in permits difficult. To remedy this, Congress adopted section 303(c)(2)(B), which essentially required development of numeric criteria for those water body segments where toxic pollutants were likely to adversely affect designated uses.

*at* http://www.epa.gov/waterscience/standards/about/history.htm

> All surface waters shall be free from pollutants in concentrations or combinations that are toxic to humans, aquatic life, or wildlife. For pollutants not otherwise listed in 314 CMR 4.00, the *National Recommended Water Quality Criteria*: 2002, EPA 822-R-02-047, November 2002 published by EPA pursuant to Section 304(a) of the Federal Water Pollution Control Act, are the allowable receiving water concentrations for the affected waters….

BWSC has acknowledged that the EPA criteria establish the toxicity threshold in waters that receive its discharges.  E.g., Ex. L Appx B at B-58, table 3-4 n.3 (identifying "US EPA National Recommended Water Quality Criteria" as the applicable toxicity criteria for dissolved copper and dissolved zinc).  Hence, discharges that contain copper or zinc in excess of water quality criteria for these toxic metals are unlawful "discharges of toxics in toxic amounts."

BWSC has; therefore, through its own data and analysis, admitted facts compelling a ruling that it is liable for numerous, continuing violations of its NPDES permit's prohibition on "discharges of toxics in toxic amounts."

## III.   BWSC IS VIOLATING ITS PERMIT BY FAILING TO MAKE NECESSARY UPDATES TO ITS STORMWATER MANAGEMENT PLAN

In addition to the discharge prohibitions discussed in the previous sections, BWSC's permit affirmatively obligates it to update its Stormwater Management Program (SWMP) to correct and prevent further unlawful discharges.  Facts ¶38.  ("The SWMP shall be updated as necessary to ensure conformance with the requirements of the CWA § 402(p)(3)(B)"[22]; id. ("The storm water pollution prevention and management program requirements of this Part shall be implemented through the SWMP submitted as part of the permit application and revised as necessary.").  As the Permit Fact Sheet explains, "[t]he SWMP is intended to be a tool to achieve the maximum extent practicable and water quality standards."  Facts ¶ 39 (Emphasis added).  Yet despite the permit's clear requirement that BWSC "update" and "revise" its SWMP as necessary

---

[22] Codified at 33 U.S.C. § 1342(p)(3)(B).

in response to the water quality problems identified by BWSC's own certified monitoring, its SWMP remained unlawfully frozen in time.

For example, as early as 2004, BWSC readily acknowledged that "[t]he fact that the metals occur primarily in dissolved form, suggests that conventional BMPs aimed at solids control will be ineffective at addressing metals toxicity." Ex. G at 3-3. Notwithstanding this recognition, and despite the permit's unequivocal prohibition of "discharge of toxics in toxic amounts", the record contains no evidence that BWSC updated the BMPs in its SWMP to address its consistent exceedances of toxicity standards. Nor is there any indication that it updated the structural controls in its SWMP to address the numerous violations of bacterial standards, even though the permit clearly envisions an adaptive deployment of such controls "where pollution prevention measures prove unfeasible or ineffective in achieving water quality standards." *See* Facts ¶ 12 (Recognizing that structural BMPs, though "more costly," are part of a "comprehensive" SWMP required by the CWA permit).

In addition to conclusively establishing violations of bacterial and toxicity standards, BWSC's certified annual reports also contain binding admissions that BWSC failed to update its SWMP as necessary in the face of its troubling monitoring data. Year after year, BWSC's reports contained the same statement "No changes to the Commission's stormwater management program and pollution prevention activities are proposed at this time." Facts ¶¶40-41. This repeated admission conclusively establishes BWSC's persistent failure to take necessary corrective actions by updating its Storm Water Management Program and entitles CLF to summary judgment on Count VI of its complaint.

## IV.  BWSC IS VIOLATING THE PERMIT BY FAILING TO ADEQUATELY MONITOR AND SCREEN DISCHARGES FROM ITS MS4

BWSC's admissions and other undisputed facts show that BWSC continues to violate the Permit by failing to comply with its representative drainage area monitoring, receiving water monitoring, and wet-weather screening requirements. These requirements are "essential elements of the CWA's enforcement procedures" and "a fundamental aspect of the [Clean Water] Act's NPDES system." <u>See</u> <u>Sierra Club v. Simkins Indus. Inc.</u>, 847 F.2d 1109, 1115 (4th Cir. 1988); <u>Save our Bays and Beaches v. City and County of Honolulu</u>, 904 F. Supp. 1098, 1135 (D. Haw. 1994). The data that BWSC was required to compile through its monitoring and screening programs is "useful, independent of ascertaining compliance with maximum discharge limitations, to enable government officials and others to monitor potentially harmful trends." <u>Id</u>. Furthermore, the Permit's monitoring and screening requirements are ongoing obligations. Although the Permit expired, these mandates continue in force until the EPA acts upon BWSC's Permit renewal application. <u>See</u> <u>United States v. Zenon-Encarnacion</u>, 387 F.3d 60, 63 (1st Cir. 2004).

    A.    *BWSC Failed to Monitor the Required Number of Representative Drainage Areas*

BWSC's admissions and other undisputed facts show that BWSC continues to violate the Permit by failing to monitor five representative drainage areas. The Permit requires BWSC to implement a wet-weather monitoring program "to provide data necessary to assess the effectiveness and adequacy of control measures implemented under the SWMP." Facts ¶13. As part of this wet-weather monitoring program, the Permit requires that BWSC "shall monitor a minimum of five (5) representative drainage areas to characterize the quality of storm water discharges from the MS4." Facts ¶14. CWA regulations pertaining to MS4 permitting establish sampling of at least five areas as the minimum standard for "representative" monitoring. *See* 40 C.F.R. § 122.26(d)(2)(iii)(A).

Despite the directive to monitor at least five representative drainage areas three times per year for a period of at least two years, BWSC readily admits in its Answer that it monitored only *three* representative drainage areas subsequent to the effective date of the Permit.  Facts ¶¶ 46-47.  This is "a binding judicial admission removing the fact from contention for the duration of the litigation."  Harrington v. City of Nashua, 610 F. 3d 24, 31 (1st Cir. 2010).

BWSC originally planned to monitor stormwater quality in drainage areas representative of high-density residential, transportation, and industrial land use types.  BWSC reported that it would monitor low-density residential and commercial land use drainage areas for three storm events for one year each since BWSC had already completed one full year of monitoring in a low-density residential area in West Roxbury and in a representative commercial area in Dorchester.  Facts ¶48.  In its 2001 Stormwater Management Report ("SMR"), BWSC stated that it would cease any further monitoring of low-density areas.  Facts ¶49.

BWSC violated the Permit by unilaterally modifying the conditionally-approved Stormwater Quality Monitoring Program.  Without proper authorization under the Permit, BWSC determined that high-density residential, open space, and mixed use should satisfy the remaining three land use types required under the Permit.  See Facts ¶ 15, Ex. P.  Beginning in 2005, in its SWMR, BWSC reported that it did not plan to conduct any additional representative monitoring, notwithstanding the fact that the Permit and its monitoring conditions remained in force.  Facts ¶51.  By 2007, BWSC further violated the Permit by making the unilateral decision that it had fulfilled all of the requirements pertaining to the representative monitoring.  Facts ¶52.

B.    *BWSC Failed to Monitor the Required Number of Receiving Waters*

BWSC's admissions and other undisputed facts show that BWSC continues to violate the Permit by failing to monitor four receiving waters.  The Permit requires BWSC to implement a

17

wet-weather monitoring program "to provide data necessary to assess the effectiveness and adequacy of control measures implemented under the SWMP." Facts ¶13. As part of this wet-weather monitoring program, the Permit requires that BWSC monitor "a minimum of four (4) receiving waters three (3) times a year throughout the permit term." Facts ¶25.

In defiance of the Permit's requirement that it monitor a minimum of four receiving waters, BWSC readily admits that it monitored only *three* receiving waters. Facts ¶54. BWSC's own admissions and other undisputed facts further demonstrate that following its 2006 monitoring, BWSC terminated its monitoring of receiving waters *altogether,* thus violating the requirement that it conduct such monitoring throughout the Permit term. BWSC's Answer acknowledges that BWSC initially monitored only three receiving waters and abandoned its receiving water monitoring program subsequent to its 2006 monitoring. Facts ¶55. This is a binding judicial admission removing the fact from contention during the litigation. Harrington, 610 F. 3d at 31. Furthermore, undisputed facts also show that EPA clearly disagreed with BWSC's determination that BWSC could abandon its receiving water monitoring program. Facts ¶57.

In violation of the Permit, BWSC unilaterally altered its monitoring from the prescribed minimum of four receiving waters three times a year throughout the Permit term to only three receiving waters in 2003. See Ex. P. Furthermore, in 2007, BWSC further violated the Permit by making the unilateral decision to abandon its receiving water monitoring program. In 2007 SWMR, BWSC notified EPA that it had completed its receiving water monitoring requirements under the Permit and that it was not planning any further receiving water monitoring. Facts ¶ 56. However, EPA clearly disagreed with BWSC's position that receiving water quality monitoring requirements had been satisfied. EPA responded to BWSC by clarifying that the Permit requires

receiving water monitoring *"throughout* the permit term to characterize the water quality impacts of storm water discharges from the MS4." *See* Facts ¶57 Ex. Q (quoting A at 13-14). Nevertheless, as evidenced by the undisputed facts and BWSC's own admissions, BWSC violated the Permit's requirements and abandoned its receiving water monitoring program altogether.

C.      *BWSC Failed to Screen All Major Outfalls at Least Once During the Permit Term*

BWSC's admissions and other undisputed facts show that BWSC continues to violate the Permit by failing to screen all major outfalls.  The Permit requires BWSC to "develop and implement a program to identify, investigate, and address areas within [BWSC's] jurisdiction that may be contributing to excessive levels of pollutants to the MS4 as a result of rainfall or snow melt," and that as part of this program it shall, at a minimum, "screen all major outfalls at least once during the permit term," and record and summarize certain enumerated data from each screening.  Facts ¶59.

In defiance of the Permit's requirement that it screen all major outfalls, BWSC readily admits that it discontinued wet-weather outfall screening at the end of 2000 after screening only 24 major outfalls.  Facts ¶61.  BWSC's Answer acknowledges that it stopped performing wet-weather outfall screening in 2000 after 24 major outfalls were screened.  Id.  BWSC's most recent SWMR indicates that its MS4 includes 97 major outfalls.  Facts ¶60.  However, BWSC screened *less than a quarter* of these outfalls before making the unilateral decision to discontinue wet weather outfall screening in violation of the Permit.

BWSC continues to violate the Permit's requirements through its failure to monitor the required number of representative drainage areas, monitor the required number of receiving waters, and screen the required number of major outfalls.  These continuing Permit violations

undermine "a fundamental aspect of the [Clean Water] Act's NPDES system." See Save our Bays and Beaches v. City and County of Honolulu, 904 F. Supp. 1098, 1135 (D. Haw. 1994). BWSC's binding admissions compel summary judgment against it on the issue of liability for failure to comply with the Permit's monitoring requirements.

### Conclusion

BWSC's own certified data show that discharges from its MS4 continue to violate permit conditions prohibiting violations of water quality standards and discharge toxic metals in toxic amounts.  In the face of these data, BWSC has failed to take necessary corrective actions.  It has also failed to comply with monitoring requirements designed to provide valuable water quality information to regulators and members of the public.

These conclusions are based on BWSC's binding admissions and a plain-meaning interpretation of its Permit's clear terms.  They are beyond dispute and thus demonstrate that CLF is entitled to summary judgment on the issues of liability presented in this motion.  CLF respectfully asks the Court to grant this motion so that the Court and the parties can begin to address the pressing issues involved in remedying BWSC's permit violations.

Respectfully submitted on this 20th day of September 2010 by:

CONSERVATION LAW FOUNDATION

By: __/s/Anthony Lappin Iarrapino_
Anthony Lappin Iarrapino, Esq.
BBO# 658109
Christopher M. Kilian, *pro hac vice*
15 E. State St. #4
Montpellier, Vermont 05602
Telephone: (802) 223-5992
aiarrapino@clf.org

Certificate of Service

I hereby certify that these documents filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) on September 18, 2010.  There are no nonregistered participants in this docket.

/s/ Anthony Iarrapino
15 East State St. #4
Montpelier, VT 05602
802-223-5992
aiarrapino@clf.org