UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| _____ ) | |
| CONSERVATION LAW FOUNDATION, INC., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 1:10-cv-10250 RGS |
| ) | |
| BOSTON WATER AND SEWER ) | |
| COMMISSION; VINCENT G. MANNERING, ) | |
| in his official capacity as EXECUTIVE ) | |
| DIRECTOR of BOSTON WATER AND SEWER ) | |
| COMMISSION; DENNIS A. DIMARZIO, in ) | |
| his official capacity as CHAIRMAN of BOSTON ) | |
| WATER AND SEWER COMMISSION; ) | |
| CATHLEEN DOUGLAS STONE, in her official ) | |
| capacity as BOSTON WATER AND SEWER ) | |
| COMMISSIONER; and MUHAMMAD ) | |
| ALI-SALAAM, in his official capacity as ) | |
| BOSTON WATER AND SEWER ) | |
| COMMISSIONER, ) | |
| ) | |
| Defendants. ) | |
| _____ ) | |

**DEFENDANTS' MEMORANDUM
IN OPPOSITION TO
PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

The Motion for Partial Summary Judgment filed by plaintiff Conservation Law

Foundation of New England, Inc. ("CLF") is based upon a fundamental misreading of the permit

issued by the Environmental Protection Agency (the "EPA") and the Massachusetts Department

of Environmental Protection ("DEP") authorizing discharges by defendant Boston Water and

Sewer Commission ("BWSC" or the "Commission") from its separate storm sewers (the

"Permit") and of the statute under which it was issued, the Clean Water Act.  CLF contends that,

as a matter of law, the Commission violated the Permit because (1) concentrations of pollutants

in some receiving waters into which the Commission discharged stormwater sometimes exceeded numeric water quality standards, (2) the Commission did not amend its stormwater management plan in response to those exceedances of numeric water quality standards and (3) the Commission did not conduct all of the monitoring prescribed by the Permit.

Not one of CLF's contentions is well grounded.  The Clean Water Act does not mandate that permits issued by EPA for municipal stormwater discharges require compliance with numeric water quality standards, and the Permit did not contain any such requirement.  Under the terms of the Permit, concentrations of pollutants in excess of water quality standards did not necessitate amendments to the Commission's stormwater management plan.  Finally, the Commission conducted all of the monitoring required by the Permit, as modified pursuant to the terms of the Permit.

For these reasons, the Court should deny the motion and find, pursuant to Federal Rule of Civil Procedure 56(d)(1), that questions of compliance with numeric water quality and the monitoring conducted by the Commission are not genuinely at issue and may not serve as a basis for establishing liability.

## SUMMARY OF APPLICABLE FACTS AND LAW

### A.  The Statutory Framework

The Clean Water Act established as a "national goal that the discharge of pollutants into the navigable waters be eliminated by 1985."  33 U.S.C. § 1251(a)(1).  In furtherance of this objective, Section 301(6) of the Act established the general requirements of use of the best practicable control technology currently available and compliance with any more stringent limitation, including water quality standards.  33 U.S.C. § 1311(b)(1)(A) & (C)  Other provisions

B3798192.2

of the Act established different criteria for compliance by different categories of dischargers, such as the requirement that publicly owned sewage treatment works employ secondary treatment for wastewater.  33 U.S.C. § 1311(b)(1)(B)

Among the categories of discharges separated out for special treatment under the Act is stormwater.  The provisions of the Act relating to stormwater are a part of Section 402, which provides generally that, notwithstanding the prohibitions of Section 301(a), EPA may issue National Pollution Discharge Elimination System ("NPDES") permits authorizing the discharge of pollutants.  33 U.S.C. § 1342.  The standards for permits relating to stormwater discharges appear in Section 402(p).

As to stormwater discharges requiring permits, Section 402(p)(3) draws a marked distinction between permits for stormwater discharges associated with industrial activity and those for discharges from municipal storm sewers.  *Compare* 33 U.S.C. § 1342(p)(3)(A) *with* § 1342(p)(3)(B).  Specifically, Section 401(p)(3)(A) requires that "[p]ermits for discharges associated with industrial activity shall meet all applicable provisions of [S]ection 301."  *Id.*  In contrast, Section 401(p)(3)(B) provides that "[p]ermits for discharges from municipal storm sewers . . . shall include a requirement to effectively prohibit non-stormwater discharges into the storm sewers . . . and shall require controls to reduce the discharge of pollutants to the maximum extent practicable. . . ."  *Id.*

## B.  The Commission

The Commission was established in 1977 "to maintain 'a sound economical and efficient water supply and distribution system and sanitary sewerage system.'"  *Farrell v. Boston Water and Sewer Comm'n*, 24 Mass. App. Ct. 583, 588-89 (l987) (*quoting* Mass. St. 1977, c. 436, § 1).

Section 3 of the Commission's Enabling Act made it a "body politic and corporate and political subdivision of the commonwealth" separate from the City of Boston.  Mass. St. 1977, c. 436, § 3. Then, as now, much of Boston's sewerage system was combined, and the "Sewerage Works System" transferred to the Commission by the City encompassed not only sanitary sewers but also "storm water sewers including catch basins and surface drains."  *Id*. §§ 2, 5.  The rights and powers enumerated in its Enabling Act that the Commission received from the City did not include control over maintenance and operation of city streets, the ability to construct control structures on rights of way and other City property or authority over permitting construction and reconstruction of buildings and other structures.

## C.  The Permit

Acting jointly with DEP, EPA signed the Permit, which was the Commission's first permit for stormwater discharges, on September 29, 1999.  Ex. A at 1.[1]  It became effective 30 days later.  *Id.*  The Permit specified that its term expired five years thereafter.  *Id.*

The Permit set forth not only the specific activities the Commission was to undertake pursuant to Section 401(p)(3)(B) but also the ultimate statutory goals of Section 301.   In that regard, the Permit did not require that the Commission's stormwater discharges and the waters into which they discharged meet numeric water quality standards and, indeed, expressly stated that "no numeric effluent standards have been established for this permit."  *Id.* at 13. The Permit does state in Part I.B.2.a, a section captioned statutory requirements, that "[t]he permittee shall select measures or controls to satisfy . . . water quality prohibitions" on discharges of toxics in

---

[1] Exhibits "A" through "Q" are attached to the Affidavit of Anthony Iarrapino; Exhibits "R" through "DD" are attached to the Affidavit of James J. Steinkrauss.

toxic amounts, of pollutants in quantities that would cause a violation of State water quality standards or of either a visible sheen, foam, or floating solids." *Id.* at 5.

A fact sheet issued on the draft permit shows that both DEP and EPA had concluded, before issuance of the Permit, that the Commission already had met the requirement to select measures to meet water quality prohibitions. In the Fact Sheet, EPA stated that "[i]mplementation of the [Commission's Storm Water Management Program] is expected to result in the protection of water quality." Ex. B at 5. It also reported that "staff of the Massachusetts Department of Environmental Protection has reviewed the draft permit and advised EPA that the limitations are adequate to protect water quality standards." *Id.* at 10.

The controls and limitations the Commission was to implement are listed in Part I.B. That provision summarizes the Commission's obligations as "to develop and implement a storm water pollution prevention and management program designed to reduce, to the maximum extent practicable the discharge of pollutants from the Municipal Separate Storm Sewer System." Ex. A at 3. The program requirements are to be "implemented through the [Storm Water Management Program] submitted as part of the [Commission's] permit application and revised as necessary." *Id.* The elements of that program fall into two categories: Pollution Prevention Requirements, which include such measures as collecting used motor vehicle fluids and other hazardous waste, and Storm Water Management Program Requirements, which include such undertakings as ensuring that roadways and highways are maintained and operated so as to minimize the discharge of pollutants. *Id.* at 3-10.

The Permit recognizes that the Commission is an agency with limited powers. All of the Pollution Prevention Requirements and all but four of the Storm Water Management Program Requirements require only that the Commission "assist," "coordinate" or "cooperate" with

appropriate municipal authorities or other public bodies in the specified activities.  *Id.*  The four

Storm Water Management Program Requirements the Permit expects the Commission to carry

out on its own are operating and maintaining catch basins and other structural stormwater

controls that BWSC owns or operates, completing flood control projects that are within its direct

control, detecting and removing illicit discharges and continuing to implement its site plan

review process.  *Id.* at 5-10.  After acknowledging in the Fact Sheet that "[s]ome of the elements

of the [Storm Water Management Program] are wholly or in part the responsibility of the City of

Boston rather than BWSC," EPA observed that it had requested permitting information from the

City that would be used to develop permit conditions for activities within the City's control, a

development that would be effected through a modification naming the City as a co-permittee or

issuance of a separate permit to the City.  Ex. B at 5.

　　　In addition to pollution prevention and stormwater management, the Permit provided for

monitoring and screening.  Part I.C.1.a required monitoring of discharges in five representative

drainage areas three times a year for two years. Ex. A at 14-15.   Part I.C.1.b required monitoring

of four receiving waters three times a year throughout the permit term.  *Id.* at 14-16. Part I.C.6

required wet weather screening of all major outfalls at least once during the permit term.  *Id.* at

16-17.  The Recitation in Part I.C of the Permit of the various purposes that monitoring of

pollutants in stormwater discharges and receiving waters would serve did not include

ascertaining compliance with water quality standards.  *Id.* at 13.

　　　The Permit contemplated modifications initiated by the Commission.   BWSC was to

assess modifications necessary to comply with  the requirement of Section 402(p)(3)(B) of the

Act to reduce the discharge of pollutants to the maximum extent practicable. Ex. A at 11.  The

Permit did not suggest that it should assess modifications necessary to comply with water quality

standards.  Modifications adding components, controls or requirements BWSC could make at any time upon notification to EPA. *Id.* at 12.  A request by the Commission to replace or eliminate a program component would become effective after 60 days unless within that time EPA commented upon or denied the request**.** *Id.*  The monitoring and screening sections made additional provision for modifications.  *Id.* at 14-17.

As contemplated by the Permit, the Commission and the regulatory agencies agreed upon modifications of the requirements for monitoring and screening.  In its initial monitoring plan, the Commission proposed changes to the requirements for representative drainage area monitoring.  Ex. U.  In a subsequent submission, it proposed to eliminate what had proved to be unproductive wet weather screening and to decrease the number of different receiving waters sampled while increasing the number of different points sampled and the total number of samples.  Ex. X at 4-3, 4-4.  Both EPA and DEP approved all of these modifications.  Ex. P at 4-6; Ex. Z.

Neither regulatory agency suggested to the Commission that the results of its receiving water monitoring constituted or revealed violations of the Permit.  Affidavit of John J. Sullivan, Jr., ¶ 3.  The monitoring showed that concentrations of some pollutants—principally bacteria and dissolved copper and zinc—in some receiving waters sometimes exceeded water quality standards.  Monitoring and studies showed that high concentrations of the two metals were typical of urban waters and that the Commission's discharges were not "the primary cause of metals and bacterial pollution in the [two] brooks" sampled in the course of monitoring.  E.g., Ex. N at 11.  These results did not cause EPA to advise the Commission that it was in violation of the Permit.  Sullivan ¶ 3.  After receiving results showing exceedances of water quality standards, DEP advised the Commission that it was in compliance with the Permit.  Ex. Z.

B3798192.2

By 2007, the Commission believed it had completed all of the monitoring required by the Permit.  By letter dated May 22, 2007, the Commission advised EPA and DEP of its position and its intention not to conduct further monitoring.  Ex. DD.  Neither regulatory agency expressed the view that the Commission had an obligation under the Permit to continue monitoring or otherwise responded to the letter.  <u>Sullivan</u> ¶ 6.

## ARGUMENT

Summary judgment is appropriate only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits…show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A material fact "is one that would affect the outcome of the suit, while a genuine issue is one for which the evidence would permit a reasonable jury to return a verdict for the nonmoving party."  *Zimmerman v. Puccio*, 613 F.3d 60, 70 (1st Cir. 2010).  The court "must view the entire record in the light most hospitable to the party opposing summary judgment, indulging all reasonable inferences in that party's favor."  *Griggs-Ryan v. Smith*, 904 F.2d 112, 115 (1st Cir. 1990).

CLF is not entitled to partial summary judgment on liability.  The assumption upon which the first ground of the motion is based, that NPDES permits for discharges from municipal storm sewers must require compliance with water quality standards, is incorrect.  Once it is established that EPA need not require municipal separate storm sewer systems to meet water quality standards, the better reading of the Permit is that it did not do so here.  At the very least, the Permit is ambiguous on its face, and the extrinsic evidence before the Court, most notably the lengthy and consistent course of conduct by the agencies that issued the Permit, indicates that the

Commission's discharges were not required to comply with water quality standards.  Of course,

any perceived ambiguity not resolved in this manner forecloses summary judgment for CLF.

The second ground of the motion, that the Commission did not modify its stormwater

management program to remedy its violations of water quality standards, falls with the first.  The

third ground, that the Commission did not carry out monitoring and screening to the extent and

in the exact manner originally prescribed by the Permit, ignores the Permit's provisions

governing modification of its conditions, the Commission's invocation of those terms and the

approval of the regulatory agencies.


I.      **Concentrations Of Pollutants In Excess Of Water Quality Standards Are Not Violations Of The Permit.**

   A.      **Permits For Municipal Storm Sewer Discharges Need Not Require Compliance With Water Quality Standards.**

The section of the Act governing stormwater discharges draws a distinction relating to

compliance with water quality standards between municipal storm sewer discharges and other

stormwater discharges.  Section 402(p)(3)(A), which governs industrial discharges, specifies that

permits for stormwater discharges shall meet all applicable requirements of Section 301, which

requires compliance with numeric water quality standards.  In contrast, Section 402(p)(3)(B),

which governs municipal stormwater discharges, states only that permits shall require

elimination of non-stormwater discharges and reduce pollutants to the maximum extent

practicable; there is no mention of compliance with water quality standards.

The only two courts to have addressed the issue have interpreted these provisions to

establish, contrary to CLF's assumption, that permits for municipal stormwater need not contain

requirements of compliance with water quality standards.  *Defenders of Wildlife v. Browner*, 191

F.3d 1159 (9th Cir. 1999), involved a challenge to EPA's decision to issue stormwater discharge permits to five municipalities without requiring numeric limitations to ensure compliance with water quality standards.  The Court found determinative the distinction drawn by Congress between industrial and municipal stormwater discharges with respect to Section 301's requirement of compliance with water quality standards.  Section 402(p)(3)(B)(iii) "*is not merely silent* regarding whether municipal discharges must comply with [Section 301] the Court observed, rather it *replaces* § 1311 with the requirement that municipal storm-sewer discharges 'reduce the discharge of pollutants to the maximum extent practicable…including…such other provisions as the Administrator…determines appropriate for the control of such pollutants'." 191 F.3d at 1165 (emphasis in original.)  Thus, the Court concluded, the statute unambiguously demonstrates that Congress did not require municipal storm-sewer discharges to comply strictly with [Section 301(b)(1)(C).] " *Id.*  Because the Court found the provision to be unambiguous, it did not have to rely on EPA's interpretation - as shown by its issuance of the challenged permits and its litigating position - that Section 402(p)(3)(B)(iii) did not require compliance with water quality standards.

To the same effect is the decision in *Miss. River Revival, Inc. v. City of St. Paul*, 2002 U.S. Dist. LEXIS 25384 (D. Minn. Dec. 2, 2002), where an environmental group sued because St. Paul's municipal storm sewer discharge did not comply with water quality standards.  The Court granted summary judgment to the City, rejecting the argument that the permit's reference to regulations requiring compliance with Section 301 incorporated that requirement into the permit. *Id*. at *19.   The Court held that "while [the Act] requires permits to contain conditions that ensure water quality standards are met, the [Act] specifically exempts municipal storm water permittees from that requirement . . . [and] thus St. Paul does not violate any water quality

B3798192.2

standards are not incorporated into its permit." *Id.*   Indeed, since EPA's requirements are set

forth in the permit, and "…compliance with a permit shall be deemed compliance . . . with

section 301…." (Section 402(k)), compliance with the permit is all that is required.  *Id.*


**B.      The Permit Does Not Require Compliance With**
**           Water Quality Standards.**

The interpretation of a NPDES permit is generally a question of law for the Court. *See*

*American Canoe Ass'n, Inc. v. Dist. of Columbia Water & Sewer Auth.,* 306 F.Supp2d 30, 42

(D.D.C. 2004)  A court is to interpret a permit in the same manner it interprets a contract,

considering the document as a whole in context. *Id.*  If the terms are ambiguous, a court may

consider extrinsic evidence.  *Id.* As to what extrinsic evidence is persuasive, some courts have

held that "in construing a permit provision, the Court should defer to the interpretation of the

agency charged with enforcement of its terms."  *Natural Resources Defense Council, Inc. v.*

*Texaco Refining & Marketing*, 20 F. Supp. 2d 700, 709-10 (D. Del. 1988).   However, informal

agency interpretations like those set forth in fact sheets that do not have the force of law are not

entitled to *Chevron*-style deference.  *Christensen v. Harris County*, 529 U.S. 576, 587 (2000).

These constructions "are entitled to respect . . . but only to the extent that those interpretations

have the power to persuade." *Id.* at 588.  What does merit deference is an agency's longstanding

established interpretation, as shown through its conduct.  *Commonwealth v. Blackstone Valley*

*Elec. Co*., 67 F.3d 981, 991 (1st Cir. 1995).

CLF's interpretation of the Permit to require compliance with numeric water quality

standards ignores every one of these standards of interpretation.  CLF relies upon brief quotes

from a few terms of the Permit, failing to  consider the Permit as a whole and taking no account

of the context in which it was issued.  CLF treats EPA's fact sheet as if it were the Permit itself,

while utterly ignoring far more persuasive extrinsic evidence, the longstanding agency interpretation shown by EPA's action and inaction during the decade in which the Permit has been in effect.  When appropriate standards of interpretation are employed, it becomes evident that CLF's interpretation is incorrect.

Viewed on its face and read as a whole, the Permit requires that pollutants be reduced to the maximum extent practicable and does not require compliance with numeric water quality standards.   No term of the Permit states that the Commission's discharges shall meet water quality standards.  The requirement that the elements of the Commission's Storm Water Management Program protect water quality standards already had been met when the Permit was signed; the Fact Sheet, which was issued more than a year before the Permit was signed contained acknowledgements by both agencies that the elements of the Commission's permit application, which became its Storm Water Management Program, would protect water quality standards. Ex. B at 5, 10.  The Permit required the Commission to amend the elements of its program if necessary to reduce the level of pollutants to the maximum extent practicable but not if necessary to meet water quality standards.  Ex. A at 11.  Similarly, the Permit specified a number of purposes for the monitoring and screening it required; not one of  them was to ascertain whether the Commission's discharges met water quality standards.  *Id. at 13.*

Consideration of the context in which the Permit was issued produces the same result. The Commission is not an agency of the City of Boston but is rather a separate legal entity with circumscribed powers.  Ex. R.  EPA acknowledges in the Permit that the Commission does not have the power or authority to carry out most of the conditions the agency considered necessary to reducing the level of pollutants and protecting water quality but could be expected only to assist, coordinate or cooperate with the municipal and other agencies which did have that power.

B3798192.2

Ex. A at 3-10.  In its response to comments on the draft permit, EPA stated that a failure by one of those agencies to take actions required to meet those conditions would not be a violation of the Permit by the Commission.  Ex. S at 8.  It would be a perverse result for the Commission to be held liable for the consequences of a failure to take action when it was acknowledged not to be liable for the failure itself.

Extrinsic evidence does not suggest a contrary result.  The only extrinsic evidence on which CLF relies is EPA's Fact Sheet.  That reliance is misplaced.  Agency Fact Sheets are entitled generally to little weight (*See Christensen*, 529 U.S. at 587), and the Fact Sheet at issue here is entitled to even less for it is not contemporaneous.  The Fact Sheet was issued on a draft permit, more than a year before issuance of the final Permit and before EPA had solicited, received and responded to comments on the draft permit.  More important, the Fact Sheet refers to compliance with water quality standards as a statutory requirement.  The reference is therefore inconsistent with EPA's institutional interpretation, as shown by its position in *Browner*  that the statute did not require compliance with water quality standards.  Moreover, the referenced statutory requirement appears in Section 301 of the Act, and Section 402(p)(3)(B)(iii) exempted discharges from municipal storm sewer systems from compliance with Section 301.  As the Court held in *Miss. River Revival*, references in a permit to legal requirements from which the permittee is exempted do not incorporate those requirements in the Permit.  2002 U.S. Dist. LEXIS 25384, *19.

The persuasive extrinsic evidence buttresses the conclusion that the Permit did not mandate compliance with water quality standards.  That evidence is in the form of a longstanding administrative interpretation.  Shortly after the Permit became effective, an EPA official who had played a role in its issuance wrote a memorandum detailing what the Commission was required

to do and how it was to do it.  Ex. T.  Before detailing all of the controls, monitoring and

reporting required by the Permit, the memorandum characterized the requirements of the Permit

as to "[d]evelop and implement a stormwater pollution prevention and management program to

reduce discharge of pollutants from the MS4 to the MEP." *Id.* at 1.  There is no mention in the

memorandum of compliance with water quality standards.  That construction remained EPA's

interpretation of the Permit for the next decade.  The Commission reported year after year that

some of the receiving waters into which it discharged sometimes did not meet water quality

standards in some respects.  Sullivan ¶ 4.  EPA never once suggested that these exceedances

constituted a violation of the Permit. *Id.*  After receipt of some of those sampling results, DEP

stated that the Commission was in compliance with the Permit.  Ex. Z.


**II.    The Permit Does Not Require Modifications In Response To Water
         Quality Violations.**

        Both logic and the words of the Permit compel the conclusion that the Commission need

not modify its Storm Water Management Program if monitoring shows that some receiving

waters do not meet water quality standards.  The Permit requires the Commission to "participate

in an annual review of its current SWMP in conjunction with preparation of [an] annual report"

and to include as part of that review "[a]n assessment of any SWMP modifications needed to

comply with the CWA §402(p)(3)(B)(iii) requirement to reduce the discharge of pollutants to the

maximum extent practicable (MEP)."  Ex. A at 11.  The Permit contains no requirement to assess

modifications needed to comply with water quality standards. *Id.*  Nor would it be logical for it

to do so.  If, as is the case, the Permit does not require achievement of water quality standards, it

would make no sense to establish not achieving those standards as a trigger for remedial action.

**III.     The Commission Complied With The Monitoring And Screening Requirements Of The Permit.**

There is no merit to CLF's contention that the Commission violated the Permit by failing to carry out mandated monitoring and screening.  Indeed,  CLF is able to make these assertions only by utterly ignoring the provisions of the Permit providing for modification of the monitoring and screening requirements and the actions by the Commission and regulatory agencies that effected modifications.

**A.     The Commission Performed The Required Monitoring Of Representative Drainage Areas.**

Part I.C.1.a of the Permit required the Commission to submit within 90 days after the effective date of the Permit a proposed sampling plan to monitor a minimum of five representative drainage areas three times a year for a period of at least two years "within the five year term of the permit."   Ex. A at 14.  The Commission was "permitted to submit an alternative plan for sampling frequency only subject to the approval of EPA or DEP." *Id.*  "Unless commented on or denied by the Director within 60 days after its submittal, the proposed sampling plan shall be deemed approved. . . ." *Id.*

In compliance with the terms of the Permit, the Commission submitted a sampling plan on January 26, 2000. Ex. U.  The plan proposed to sample five drainage areas with the requisite frequency and two-year duration and requested that credit be given for monitoring of low-density residential and commercial drainage areas that already had been completed or was under way. *Id.* at 2.  By letter dated February 25, 2000, EPA approved the stormwater monitoring plan, with a single reservation: determination whether the Commission would receive credit for the monitoring already performed or in progress in two areas would be reserved until a review of the

final report relating to one of those areas.  Ex. U.  In its Annual Report for 2000, submitted in
April 2001, the Commission proposed a further modification: substitution of open space and
mixed use drainage areas for transportation and industrial areas.  Ex. W at 51-52.  Neither EPA
or DEP objected.  By memorandum dated, April 24, 2003, EPA determined that all of the
requested modifications were reasonable and appropriate and approved them, giving credit for
the monitoring already conducted in more than six storms in each of low-density residential and
commercial drainage areas and agreeing that the balance of the program required monitoring six
storms in high-density residential, open space and mixed use drainage areas.  Ex. P at 4-5.  DEP
also approved the requested modifications by letter dated May 13, 2003.  Ex. Z.

The Commission carried out the monitoring of representative drainage areas, as modified
by its requests and the approvals of the regulatory agencies, in full. The total number of
representative drainage area samples exceeded the number required in the Permit.  Ex. P at 4-5.
In its 2005 Annual Report, the Commission reported that it had concluded this program in 2004
and stated that it planned no additional representative stormwater monitoring.  Ex. B at 5-1.
Neither regulatory agency suggested to the Commission that additional representative
stormwater monitoring was required.  Sullivan ¶ 6.

**B.**     **The Commission Performed The Required Receiving Water Monitoring.**

Part I.C.1.b of the Permit required the Commission to submit within 90 days after the
effective date of the permit a sampling plan to "monitor a minimum of four (4) receiving waters
three (3) times a year throughout the permit term. . . ."  Ex. A at 14.  "Unless commented on or
denied by the Director within 60 days after its submittal," the Permit provided, "the proposed
sampling plan shall be deemed approved. . . ."  *Id.*

The Commission submitted a sampling plan on January 26, 2000.  Ex. U.  The plan proposed to sample four receiving waters without identifying them. *Id.*  By letter dated February 25, 2000, EPA approved the sampling plan.  Ex. V.  In its Annual Report for the year 2000, the Commission reported having evaluated five receiving waters and selected three for monitoring.  Ex. W at 46-47.  In the 2001 Annual Report, which the Commission submitted in early 2002, it reported having conducted monitoring at one point in one water body and two points, one upstream and one downstream of stormwater outfalls, in two other water bodies and requested clarification whether this monitoring complied with the requirement to monitor four receiving waters.  Ex. X at 4-3.  In a memorandum dated April 23, 2003, EPA recounted the history of the Commission's selection of receiving water monitoring points, including its request for clarification, and concluded that the "proposed revisions to the sampling plan are acceptable to EPA."  Ex. P at 5.  In a letter dated May 13, 2003, DEP found "the following modifications of the Stormwater Quality Monitoring Program (SQMP) reasonable and appropriate[:]  Changes to Wet Weather Receiving Water Quality Monitoring."  Ex. Z.

The Commission carried out the monitoring of receiving waters, as modified by its request for clarification and the approvals of EPA and DEP, for five years.  The number of samples it took each year exceeded the annual number required by the Permit.  Ex. P at 5.  By letter dated May 22, 2007, the Commission advised the regulatory agencies that it had completed the receiving water monitoring required by the Permit and planned to cease that monitoring.  Ex. DD.  Neither EPA nor DEP advised the Commission that it had an obligation to continue receiving water monitoring.  Sullivan ¶ 6.  In particular, the Commission did not receive any version of the draft letter attached to CLF's motion, and in response to the Commission's request, EPA indicated that it did not have a final version of the letter.  *Id.*

C. __The Commission Performed The Required Wet Weather Screening__.

Part I.C.6 of the Permit required the Commission either to develop a wet weather screening program to "screen all major outfalls at least once during the permit term" or to "submit an alternate wet weather screening pilot program." Ex. A at 16-17. If that alternative were selected, a "pilot program concept" was to be submitted within 90 days after the effective date of the Permit. *Id.* at 17. It was to "identify reasons [why] a system wide screening program would not be effective." *Id.*

On January 26, 2000, the Commission submitted a pilot program concept for wet weather screening. Ex. U. The Commission proposed to "implement the wet weather outfall screening program on a trial basis for one year" and to "request that the wet weather outfall screening be discontinued" if "the data collected in the first year is not considered useful." *Id.* at 4-5. In the Program Modifications section of its Annual Report for 2001, after the conclusion of the one-year trial program, the Commission reported that, because the "results of wet weather screening indicate that very little additional information is gathered, . . . wet weather screening of major outfalls was discontinued." Ex. X at 4-4. Neither EPA nor DEP denied or commented upon the modification within 60 days. EPA's memorandum of April 23, 2003 stated that "EPA approves BWSC's proposal to eliminate the required Wet Weather Screening Program." Ex. P at 6. Similarly, the modifications approved by DEP in its letter of May 13, 2003 included "Elimination of wet weather screening of major outfalls." Ex. Z.

In sum, CLF's assertions of Permit violations arising from monitoring and screening--like its motion as a whole--consist largely of pious pronouncements and quick condemnations that lack support in the law, the terms of the Permit or the facts.

B3798192.2

## CONCLUSION

For the foregoing reasons, the Court should deny CLF's motion for partial summary judgments and make findings pursuant to Rule 56(d)(1) of the Federal Rules of Civil Procedure that the Permit does not require compliance with water quality standards and that the Commission conducted monitoring and screening in accordance with the permit.

Respectfully submitted,


/s/ John M. Stevens
John M. Stevens, BBO #480140
Elisabeth M. DeLisle, BBO #658067
Amy E. Boyd, BBO #667482
Foley Hoag LLP
Seaport World Trade Center West
155 Seaport Boulevard
Boston, MA   02210
(617)  832-1000
jstevens@foleyhoag.com
edelisle@foleyhoag.com
aboyd@foleyhoag.com

Of Counsel:

James J. Steinkrauss (BBO #647497)
Deputy General Counsel
Boston Water & Sewer Commission
980 Harrison Avenue
Boston, Massachusetts   02119
(617)  989-7312
steinkraussjj@bwsc.org


Dated:   October 12, 2010

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 12, 2010, a true and accurate copy of the foregoing was served via electronic mail upon all attorneys of record for the Conservation Law Foundation and via first-class mail to the following address:

Anthony Iarrapino
Conservation Law Foundation, Inc.
15 East State Street, Suite 4
Montpelier, VT 05602

/s/ John M. Stevens
John M. Stevens

B3798192.2