UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| CONSERVATION LAW FOUNDATION, INC., )<br>              Plaintiff, )<br>v. )<br>               )<br>BOSTON WATER AND SEWER )<br>COMMISSION, et al. )<br>              Defendants. )<br>_____ ) | Case No. 1:10-cv-10250-RGS |

<u>REPLY MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR
PARTIAL SUMMARY JUDGMENT</u>

CLF is entitled to summary judgment for the following reasons. BWSC's Permit unambiguously sets forth prohibitions that BWSC is required to satisfy. BWSC's certified annual reports and the data they contain are legally-conclusive admissions that BWSC failed to satisfy the Permit's prohibitions. The record shows that BWSC failed to take required remedial action after its initial failures became clear. BWSC abandoned its required wet weather monitoring programs in a manner that violated the Permit's express terms and applicable NPDES regulations. The extrinsic evidence BWSC relies on to suggest a contrary result on these issues is immaterial as a matter of law.

The parties present no genuine issues of material fact, only disputes over what those facts mean under controlling law. Applying that law faithfully and consistent with the purposes of the CWA compels summary judgment that BWSC is liable for Permit violations.

**I.    BWSC'S MS4 DISCHARGES UNLAWFULLY VIOLATE WATER QUALITY
      STANDARDS**

   A. *BWSC's Permit Unambiguously Prohibits BWSC From Discharging Pollutants In
      Quantities That Would Cause A Violation of A State Water Quality Standard*

    1. <u>The Permit's Plain Language is Unambiguous</u>

1

The permit unambiguously requires BWSC to "select measures or controls to satisfy the following water quality prohibitions: <u>No discharge of toxic in toxic amounts.  No discharge of pollutants in quantities that would cause a violation of State water quality standards</u>."  Ex A at 5 (Emphasis in original).  By these express terms, BWSC is required to "satisfy" enumerated "prohibitions" applicable to the discharges from the MS4 its operates and controls.  Merriam-Webster's Dictionary defines the term "satisfy" as follows: "to carry out the terms of (as a contract)," and alternatively "to conform to (as specifications) **:** be adequate to (an end in view)."[1]  It defines "prohibition" as "an order to restrain or stop."[2]  Similarly, Black's Law Dictionary (9th Ed. 2009) defines a "prohibition" as "[a] law or order that forbids a certain action."  The words used in § I.B.2.a, read in light of their plain and ordinary meaning, unambiguously set forth a prohibition against discharges that would cause a violation of WQS and require BWSC to satisfy this prohibition through SWMP implementation during the permit term.

Reading § I.B.2a.'s "prohibitions" in the context in which they appear confirms that they compel summary judgment on liability when applied to the undisputed facts in the record.  Subsection I.B "Storm Water Pollution Prevention & Management Programs" makes clear that the prohibitions at I.B.2.a, among others, are enforceable permit requirements over and above the general requirement to comply with the maximum extent practicable (MEP) standard.  It states that "the permittee'storm water pollution prevention and management programs shall satisfy the requirements of <u>Part I.B.1-7</u> below for all portions of the…(MS4) authorized this permit <u>and</u> shall reduce the discharge of pollutants to the maximum extent practicable."  Ex A at 3 (First emphasis in original, second added).  Moreover, § I.B.2 titled "Stormwater Management

---

[1] http://www.merriam-webster.com/dictionary/satisfy
[2] http://www.merriam-webster.com/dictionary/prohibition?show=0&t=1287598065

Program Requirements" emphasizes that "[t]he SWMP, and all approved updates, are hereby incorporated by reference and shall be implemented in a manner consistent with the following requirements:". Ex A at 4. Among the "following requirements" is the § I.B.2.a requirement to select measures or controls to "satisfy" "prohibitions" on water quality standards violations. In fact, this requirement follows directly at the top of the next page. Id. at 5.

BWSC ignores the Permit's clear statement requiring it to satisfy both the prohibitions at I.B.2.a and reduce discharge of pollutants to the maximum extent practicable. Id. at 3. Instead, it bases its misreading of the permit as requiring compliance only with the "maximum extent practicable" standard, by asserting that "the Permit specified a number of purposes for the monitoring and screening it required; not one of them was to ascertain whether the Commission's discharges met water quality standards." BWSC at 12 (citing Ex. A at 13). Yet, the section BWSC cites, I.C.1 "Wet Weather Monitoring and Reporting Requirements" also omits any reference to ascertaining whether the Commission's discharges comply with the MEP standard. Instead of directly referencing any of the Permit's applicable substantive water quality requirements, the Permit states that the wet-weather monitoring program's purpose is, *inter alia*, to "assess the effectiveness and adequacy of control measures implemented under the SWMP" Ex A at 13.

The cross-reference to "control measures" links this section to all the standards-based "Stormwater Management Program Requirements." Section I.B.2.a requires BWSC's SWMP to "include controls necessary" to achieve MEP and "measures or controls to satisfy" the discharge prohibitions. Reading the Permit as a whole demonstrates that the monitoring program's purpose is to "assess the adequacy and effectiveness of control measures implemented under the SWMP" as required to meet both sets of substantive narrative standards included in I.B.2.a: MEP and the

discharge prohibitions. Rather than supporting BWSC's interpretation that the permit requires compliance with MEP only, a strightforward reading of § I.C.1 indicates that the Permit requires compliance with MEP and the other § I.B.2.a conditions and prohibitions BWSC must also satisfy through pollution control measures.

2. <u>The Permit's Unambiguous "Prohibition" on Discharges that Would Cause a Violation of WQS is Consistent with Applicable, Binding CWA Regulations</u>

For a NPDES permit to be legal, EPA, as permit issuer, must impose permit conditions that comply with applicable "regulations promulgated under CWA" and "ensure compliance" with state water quality standards such as those adopted by the state of Massachusetts. 40 C.F.R. § 122.4(a), (d). Among the "regulations promulgated under [the] CWA" is 40 C.F.R. § 122.44(d). In pertinent part, this regulation requires that NPDES permits issued to all sources, without exception, contain any requirements "necessary to achieve water quality standards" through "limitations" on pollutants or pollutant parameters that would cause or contribute to a violation of State water quality standards. 40 C.F.R. § 122.44(d); <u>see also</u> (Ex. B at 5 explaining requirements of 40 C.F.R. § 122.44(d)). Accordingly, by concluding that Permit Section I.B.2.a prohibits discharges from BWSC's MS4 that would cause a violation of WQS, the Court will honor the plain meaning of the Permit's terms and harmonize the Permit's terms with applicable NPDES regulations. Courts must generally construe the terms of a contract so that the contract will not be illegal. See <u>Martin v. Vector Co., Inc.</u> 498 F.2d 16, 24 (1st Cir. 1974) (citing 3 A. Corbin, Contracts § 546 (1960)).

BWSC's brief entirely ignores these binding permit regulations, which were in force at the time EPA issued the Permit and remain in force today, when it asserts that NPDES permits for MS4s need not require compliance with WQS. BWSC at 9. Instead, BWSC relies on its misinterpretation of nonbinding 9th Circuit precedent <u>Defenders of Wildlife v. Browner</u>—a

4

decision that came out two weeks before EPA signed BWSC's final permit.[3] That precedent, regardless of whether correctly decided, does not address the scope of EPA's NPDES permit regulations, and thus is inapposite to the task before this Court. Nonetheless, a closer reading of Defenders actually undermines BWSC's argument that EPA did not intend to require BWSC's strict compliance with water quality standards when it set forth the "prohibitions" in § I.B.2.a.

BWSC's error begins with its mischaracterization of EPA's "litigating position" in Defenders. BWSC incorrectly states that "EPA's interpretation" was "that Section 402(p)(3)(B)(iii) did not require compliance with water quality standards." BWSC at 10. This statement contradicts EPA's actual "litigating position" as summarized by the 9th Circuit:

> The EPA and Petitioners argue that the Water Quality Act is ambiguous regarding whether Congress intended for municipalities to comply strictly with state water-quality standards, under 33 U.S.C. § 1311(b)(1)(C). Accordingly, they argue that we must proceed to step two of Chevron and defer to the EPA's interpretation that the statute does require strict compliance. 191 F.3d at 1164 (Emphasis Added)

The EPA interpretation to which the 9th Circuit declined to defer is set forth in an EPA General Counsel's Opinion issued after the 1987 Amendments to the CWA that added Section 402(p)(3)(B).[4] In pertinent part, it states as follows: "EPA's intent to apply WQS to municipal storm water discharges can also be inferred by the fact that the 1988 proposal [to change NPDES regulations] did not propose to alter 40 CFR 122.44(d), which provides that all NPDES permits must contain water quality-based requirements more stringent than technology-based requirements, where necessary to achieve WQS." Compliance With Water Quality Standards In NPDES Permits Issued To Municipal Separate Storm Sewer Systems, App. 1 at 4 n.1 (Jan. 9,

---

[3] Compare Ex A. at 1 (indicating that EPA signed BWSC's Permit September 29,1999) with 191 F.3d 1159 (indicating that case was decided September 15, 1999).
[4] Attached as Appendix 1

5

1991) (concluding that [t]he better reading of Sections 402(p)(3)(B) and 301(b)(1)(C) is that all permits for MS4s must include any requirements necessary to achieve compliance with WQS.").

Though the 9th Circuit ultimately rejected EPA's interpretation that the statutory provisions required strict MS4 compliance with WQS, its holding did not invalidate the generally-applicable NDPES permit regulation at § 122.44(d). Nor did it impinge on EPA's authority to enforce that regulation in MS4 permitting. Rather, the 9th Circuit specifically rejected the municipalities' argument that the CWA forbade EPA from requiring such strict compliance. 191 F.3d at 1166-67. It held instead that EPA has the discretionary authority to "determine that ensuring strict compliance with water quality standards is necessary to control pollutants," and to exercise that authority by including either numeric effluent limitations or Best Management Practices requirements in permits it issues. Id.

Thus, even if this Court were to accept the holding in Defenders, the most it stands for is the proposition that EPA had and has the discretion to change its binding NPDES regulation at § 122.44(d) so that it contains an express exemption for MS4s. But now, as in September 1999, §

122.44(d) contains no municipal exemption.[5]  Accordingly, BWSC's reliance on Defenders is misplaced.[6]

Recognizing the problems that the permit's actual words, syntax, and organization create for its defense, BWSC advances a novel proposition: that "the requirement that elements of the Commission's Storm Water Management Program protect water quality standards already had been met when the Permit was signed."  BWSC at 12 (citing Ex. A at 5, 10).  This argument fails because it relies entirely on extrinsic evidence and because it defies common sense.  EPA regulations do require the permitting authority to certify *a priori* that limitations in BWSC's permit would satisfy the prohibition on WQS violations.  That certification, however, would be utterly meaningless if BWSC's discharges could then violate this prohibition with impunity once the permit took effect.  The Permit unambiguously requires BWSC to "satisfy" the water quality "prohibitions" in § I.B.2.a throughout the permit term and this prohibition must be enforced according to its terms. There would be no need to include, or purpose served by including, such a prohibition in a forward-applying permit authorizing a discharge subject to conditions if the prohibitions were already, in fact, satisfied.  BWSC's creative interpretation would render the

---

[5] EPA's decision not to create an exemption to § 122.44(d) for MS4s in the wake of the 9th Circuit's Defenders decision is not surprising given EPA's disagreement with the Court's statutory interpretation—an interpretation that no other Court of Appeals has endorsed.  While the 9th Circuit's opinion has some surface appeal, the court there failed to address two central aspects of the analysis that the EPA General Counsel Opinion undertook.
   First, to reach the conclusion it did, the 9th Circuit ignored the rule of construction strongly disfavoring repeal by implication.  To read Section 402(p) as the 9th Circuit did results in an implicit repeal of both § 301(b)(1)(C) and § 401, 33 U.S.C. 1341, water quality certification requirements as those apply to MS4s.  See App 1 at 2-3.
   Second, "[t]o read Section 402(p)(3)(B) as overriding 301(b)(1)(C) requirements would also cause a conflict between Section 402(p) and the general focus of the provisions in the 1987 Amendments, many of which reflect a Congressional desire to improve compliance with the WQ-based requirements of the Act.  Id. at 3.
   Given that the EPA regulations still require NPDES permits to contain conditions ensuring compliance with WQS and to contain limits necessary to "achieve water quality standards," this Court need not resolve the larger statutory issue.  Nonetheless, it is important to note the flaws in the 9th Circuit's opinion, an opinion that is isolated in that circuit and that has not led EPA to change its regulations or its permitting approach.

[6] The unreported Minnesota District Court precedent that BWSC relies on is also inapposite to the question of permit interpretation facing this Court.  Mississippi River Revival, Inc. v. St. Paul involves a different MS4 permit that was issued exclusively by a delegated state agency rather than by EPA.  The permit at issue there lacked a clear prohibition on WQS violations like the provision at § I.B.2.a of the permit before this Court.  The court there failed to analyze, much less mention, the requirements of 40 C.F.R. § 122.44(d).

prohibitions in the Permit superfluous; a perverse result at odds with canons of construction requiring Courts to give effect to all the words of a written instrument and with the overall remedial purposes of the CWA.

    B.    *BWSC's Annual Reports Are Binding Admissions of Ongoing Water Quality Standards Violation*

For the reasons set forth more fully in CLF's opening memorandum, CLF is entitled to summary judgment based on BWSC's repeated admissions in its annual reports that its discharges contained pollutants in quantities that would cause a violation of state water quality standards. CLF at 7-12; Sierra Club v. Union Oil Co. of Cal., 813 F.2d 1480, 1492 (9th Cir.1987)[7] (holding that defendant's data monitoring reports are "conclusive evidence of exceedance of a permit limit"). CLF's motion relies on reported data from both required components of BWSC's wet weather monitoring program: "representative" monitoring and receiving water monitoring. Id. Yet BWSC's brief takes the summary judgment standard to the extreme; instead of characterizing these facts in a more favorable light, BWSC's memo ignores entirely the results of the "Representative Monitoring" mandated by its permit.

In BWSC's own pre-litigation sworn and certified reports, BWSC admitted that its "Representative Monitoring" demonstrated that "[b]acterial levels in stormwater <u>consistently exceed applicable water quality standards</u>, particularly those based on fecal coliform concentration, even in areas known to have no illegal sanitary connections….Levels of copper and zinc in runoff from the Boston area <u>consistently exceed applicable water quality criteria, particularly in dissolved form</u>." BWSC based these "conclusions" on measurements taken by BWSC agents directly from BWSC's MS4 discharge infrastructure. BWSC's own data show that water quality standards exceedances occurred in the majority of samples taken ranging from

---

[7] vac'd on other grounds, 485 U.S. 931 (1988), judgment reinstated and amended, 853 F.2d 667 (9th Cir.1988).

a 75% exceedance rate for the "less stringent" Class B fecal coliform bacteria boating standard to a 100% exceedance rate for concentrations of the dissolved toxic metal zinc.

As discussed above, Section I.C.1 states that BWSC shall implement a wet weather monitoring program for the MS4 to provide data necessary to assess the effectiveness and adequacy of control measures implemented under the SWMP." Ex A at 13. This "wet weather monitoring program" indisputably encompasses the receiving water monitoring <u>and</u> the representative monitoring. Ex. A at 14. CLF's motion demonstrates that BWSC's SWMP was ineffective and inadequate to "satisfy" § I.B.2.a's water quality "prohibitions." BWSC's is bound by the results of its own "representative monitoring" showing that BWSC's extant control measures are ineffective and inadequate.

C. *BWSC's Extrinsic Evidence Is Immaterial As A Matter Of Law*

When the terms of a permit are unambiguous, as is the case here, the Court must ignore extrinsic evidence that would yield an interpretation directly contrary to the Permit's language. <u>See</u> <u>Cozza v. Network Associates, Inc.</u>, 2005 WL 1377877, at *4 n.5 (D.Mass. 2005). Generally, all of BWSC's extrinsic evidence falls into this category of immateriality. In addition to this generalized immateriality, there are additional grounds on which this evidence is legally immaterial. Only genuine issues of "material" facts preclude summary judgment. <u>Zimmerman v. Puccio</u>, 613 F.3d 60, 70 (1st Cir. 2010).

1. <u>EPA's Enforcement Inaction isImmaterial</u>

EPA inaction in the face of NPDES violations is the *sine qua non* of a CWA citizen suit. Under the CWA, a citizen may commence a civil action against any person who is alleged to be violating the Act, but only when federal and state enforcement agencies fail to commence and diligently prosecute enforcement prior to the filing of a duly noticed citizen suit complaint in a

9

federal district court. 33 U.S.C. § 1365(a), (b)(2); See, e.g., Atl. States Legal Found, v. Eastman Kodak Co., 933 F.2d 124, 127 (2d Cir. 1991) ("The purpose of the citizen suit is to stop violations of the Clean Water Act that are not challenged by appropriate state and federal authorities."). Private citizen plaintiffs cannot be estopped from maintaining a suit because of an alleged waiver or inaction by government officials. E.g., S.P.I.R.G. v. Anchor Thread Co., 1984 U.S. Dist. LEXIS 23153, at *12-14 (D.N.J. Oct. 1, 1984) ("[I]f private citizen plaintiffs were estopped from maintaining a suit because of waivers or inaction by government officials, the effectiveness of [§ 1365] of the Act would be drastically curtailed and its purpose defeated."); accord P.I.R.G. of New Jersey v. Yates Indus., Inc., 757 F.Supp. 438, 445 (D.N.J. 1991) (holding that "[d]efendant is responsible for the terms of its permit…and violations of that permit are unlawful" regardless of contrary assurances from regulators).

BWSC urges the Court to rely on EPA's inaction to heretofore enforce the Permit's "prohibition" on WQS violations at I.B.2.a as evidence that the permit does not mean what it says. According to BWSC, the Permit does not actually require it to "satisfy" a "prohibition" on "discharges of pollutants in quantities that would cause a violation of a state water quality standard" because EPA has yet to hold BWSC accountable for its failure to satisfy this prohibition. The Court must reject this evidence (if silence and inaction can be classified as "evidence") as a matter of law, and with it the circular reasoning supporting its purported materiality; ruling otherwise would undermine the fundamental structure of citizen enforcement that Congress set forth in the act.

    2. BWSC's Opposition Is An Untimely Collateral Attack On The Permit

The CWA prohibits collateral attacks on NPDES Permits of the sort BWSC attempts to mount through its resort to immaterial extrinsic evidence. 33 U.S.C. § 1369(b)(2) ("Action of the Administrator with respect to which review could have been obtained under paragraph (1) of

10

this subsection shall not be subject to judicial review in any civil or criminal proceeding for enforcement."). Courts faced with collateral attacks by a permittee have properly declined to entertain the permittee's arguments about allegedly impractical or otherwise unenforced permit terms: "Whatever the merits of [permittee's] argument ... the Act clearly [forbids judicial review]." P.I.R.G. of New Jersey v. Yates, 757 F. Supp. 438, 445-46 (D.N.J. 1991) (citing PIRG v. Powell Duffryn Terminals, Inc., 913 F.2d 64, 77 (3d Cir. 1990), cert denied, 498 U.S. 1109 (1992)).

BWSC's collateral attack comes via its reliance on extrinsic evidence discussing BWSC's purported practical limitations in complying with various aspects of the Permit, including § I.B.2.a. E.g., BWSC at 6, 12-13 (characterizing EPA comments in "Fact Sheet" and "Response to Comments"). Here, however, the original draft permit issued with the "Fact Sheet" for public comment, contains prohibitions identical to those CLF seeks to enforce. Compare Ex. EE (BWSC Draft Permit) with Ex. A (BWSC Final Permit). Moreover, the final Permit makes clear that the buck stops with BWSC, stating that "[t]he permittee has demonstrated and shall maintain legal authority to control discharges to and from those portions of the MS4 which it owns or operates." Ex A at 10 (Emphasis added). Having had and foregone the opportunity to contest Permit requirements that BWSC considers infeasible by seeking changes during the comment period or taking an appeal after EPA finalized the Permit, BWSC is now barred from challenging applicability of those provisions in this enforcement action. See Ex. S (reflecting no objection by the Commission to § I.B.2.a. of the Permit).

Section I.B.2.a's WQS violation prohibition, as written and adopted following notice and comment, is unambiguous and controlling. BWSC has admitted violating this prohibition, through its certified annual reports; it is liable for its violations.

## II. BWSC'S MS4 UNLAWFULLY DISCHARGES TOXIC METALS IN TOXIC AMOUNTS

In addition to the blanket prohibition of discharges of pollutants in quantities that would cause water quality standards violations, the Permit also requires BWSC to "satisfy" a "prohibition" of "<u>discharge of toxics in toxic amounts</u>." Ex. A at 5 (Emphasis in original). CLF's opening memorandum demonstrates that BWSC's own annual reports contain factual admissions compelling a conclusion that BWSC's MS4 is unlawfully discharging toxics in toxic amounts and foreclosing any genuine issue of material fact on this claim. CLF at 12-14. BWSC lacks a legal or factual basis to dispute CLF's claim; thus, it has not addressed the issue at all in its brief. Through its conspicuous silence, BWSC has conceded liability.

## III. BWSC IS VIOLATING ITS PERMIT BY FAILING TO REVISE ITS STORMWATER MANAGEMENT PROGRAM AS NECESSARY TO SATISFY THE PERMIT'S DISCHARGE PROHIBITIONS

In addition to the discharge prohibitions discussed in the previous sections, BWSC's permit affirmatively obligates it to revise its SWMP as necessary to correct and prevent further unlawful discharges. BWSC's Permit commands that "[e]ither cumulatively, or separately, the permittee's storm water pollution and prevention and management programs shall satisfy the requirements of <u>Part I.B.1-7</u>," which includes the "prohibitions" on discharges that violate WQS or of toxic and toxic amounts. Ex A at 3; <u>see</u> Argument <u>supra</u> at 1-3. It further mandates that "[t]he storm water pollution prevention and management program requirements of this Part shall be implemented through the SWMP submitted as part of the permit application <u>and revised as necessary</u>." Ex A. at 3 (Emphasis added).

The Permit's plain terms require remedial action—SWMP revision—by the permittee when data shows that SWMP measures are ineffective at satisfying the Permit's discharge "prohibitions." <u>See</u> Ex A at 13 § I.C.1 (purposes of monitoring are to "assess effectiveness and

12

adequacy" of the SWMP, and "identify and prioritize portions of the MS4 requiring additional controls"). Unlike the interpretation forwarded by BWSC, this interpretation serves the overall purpose of the permitting program and the CWA. Because BWSC's opposition on this point depends on its mistaken premise that the Permit does not require BWSC to satisfy § I.B.2.a's unambiguous discharge prohibitions, both faulty premises fail together.

### IV. BWSC IS VIOLATING ITS PERMIT BY FAILING TO CONDUCT THE PERMIT'S REQUIRED MONITORING PROGRAMS

Permit § I.C establishes limited circumstances in which BWSC could have amended the Permit's required monitoring programs. Ex A at 14. Outside of those limited circumstances, BWSC is only permitted to modify the monitoring requirements through a formal notice and comment process. See 40 CFR § 122.62; 40 CFR. § 124. Furthermore, the Permit requires that both EPA and DEP approve any Permit modification in writing. Ex A at 20. BWSC abandoned its monitoring programs outside of the limited time-frames during which the Permit allowed BWSC to amend these programs. BWSC at 16 – 17. Furthermore, BWSC did not carry out this abandonment through the formal notice and comment process, and did not receive written approval from both EPA and DEP for such action. BWSC therefore did not comply with the Permit when it abandoned the Permit's required monitoring programs.

BWSC misinterprets the Permit's structure and language and ignores CWA requirements for permit modification when BWSC wrongly contends it abandoned its monitoring programs in compliance with the Permit. BWSC relies on letters from and inaction by regulators as evidence the regulators approved BWSC's determination to modify the Permit and abandon these required programs. BWSC at 16-18. BWSC's unauthorized decisions to abandon monitoring programs are not, as a matter of law, the necessary permit modifications that would absolve BWSC from liability.

NPDES permit holders have an "absolute duty to comply with [their] NPDES permit . . . regardless of oral or written representations by the permitting agency allegedly excusing compliance with permit requirements." Sierra Club v. Young Life Campaign, Inc., 176 F. Supp. 2d 1070 1081 (D. Colo. 1991).  Similarly, silence by the regulators after BWSC unilaterally abandoned such programs does not excuse BWSC's noncompliance with the Permit's requirements.  Id.  Such statements from and inaction by regulators cannot modify NPDES permits and do not provide a defense to CLF's citizen suit.  See id.  On the contrary, the regulators' failure to enforce Permit requirements is a prerequisite to CLF's citizen suit.  See Argument supra at 9-10.

A.      *Applicable NPDES Regulations and Permit Sections I.C and I.I Set Forth the Requirements for Modifying the Monitoring Requirements of the Permit*

NPDES regulations and Permit § I.C set forth the process by which BWSC can lawfully alter the Permit's monitoring requirements.  Furthermore, Permit § I.I provides that "any modification, suspension or revocation of this Permit shall be effective only with respect to the Agency taking such action, and shall not affect the validity or status of this Permit as issued by the other Agency, unless and until each Agency has concurred in writing with such modification, suspension or revocation."  Ex A at 20.  No such EPA or DEP written concurrence appears in the record with respect to BWSC's abandonment of its monitoring programs.

EPA and DEP can modify a NPDES permit under certain circumstances, such as after obtaining new information or the promulgation of new regulations.  If a modification satisfies the criteria for a "minor modification" in 40 CFR § 122.63, the agencies may modify the permit without a public hearing.  40 CFR § 122.62.  If the criteria for a minor modification are not met, EPA must prepare a draft permit, a statement of basis, and a fact sheet, followed by formal public notice and comment period. 40 CFR § 122.62; 40 CFR § 124.

BWSC's abandonment of its monitoring programs does not meet the narrow criteria for a minor modification. Minor modifications are only permitted to (a) correct typos, (b) require more frequent monitoring or reporting, (c) change an interim compliance date, (d) allow for change in ownership or control of a facility, (e) change the construction schedule for a new source, or delete a point source when discharge from that source is terminated, or take other actions not related to the class of permit at issue here. 40 CFR § 122.63. To be lawful, BWSC's modifications should, therefore, have gone through the draft permit and public notice requirements of 40 CFR § 124. See 40 CFR § 122.62; id. § 122.63. Furthermore, EPA and DEP are required to approve such modifications in writing. Ex A. at 20.

B.    *BWSC's Abandonment of Its Monitoring Programs Violates the Permit and 40 C.F.R. § 122.62*

BWSC acknowledges that § I.C contains provisions allowing for the modification of the Permit's monitoring requirements within limited time periods. BWSC at 15-18. Even if BWSC initially modified the Permit's monitoring requirements in accordance with these provisions, BWSC took further actions with respect to its monitoring programs to violate the Permit's mandates after the expiration of the time limits specified in § I.C.

BWSC claims that it abandoned its representative monitoring program in compliance with the Permit in 2004. BWSC at 16. However, the Permit allows BWSC to commence alternate representative monitoring programs only if it does so no later than 180 days from the effective date of the Permit or unless otherwise specified by EPA or DEP. Ex A at 14. BWSC concluded its representative monitoring program five years after the effective date of the Permit and well beyond this 180-day time period. BWSC also admits that neither EPA nor DEP agreed that BWSC could modify its representative monitoring program more than 180 days from the effective date of the Permit. BWSC at 16. Instead, BWSC relies on EPA and DEP silence in the

face of BWSC's unilateral decision to abandon its representative monitoring program. Silence by the regulators in the face of BWSC's unauthorized action does not amount to an approval of a permit modification. Such a modification can only be carried out through the formal modification provisions of 40 CFR § 122.62. See 40 CFR § 122.62. A NPDES permit holder has an "absolute duty to comply with [their] NPDES permit ... regardless of oral or written representations by the permitting agency allegedly excusing compliance with permit requirements," and thus a concomitant absolute duty to return to compliance when regulators are silent in response to an admittedly unauthorized abandonment of a permit requirement. See Sierra Club, 176 F. Supp. 2d at 1081. Furthermore, the Permit clearly requires that both agencies approve any modifications in writing. Ex A. at 20. BWSC violated the Permit by abandoning its representative water monitoring program without going through the required notice and comment procedure or obtaining written approval from EPA and DEP.

BWSC acknowledges that it abandoned its receiving water monitoring program in 2007. BWSC at 17. The Permit's monitoring section contains no provisions allowing BWSC to modify its receiving water monitoring program, other than the provision that allows BWSC to submit a proposed sampling plan for approval within 90 days after the effective date of the Permit. Such a plan was to be effective within 60 days after submittal. The Permit clearly states that BWSC must carry out receiving water monitoring "throughout the permit term." Ex A at 14. Therefore, like the representative monitoring requirements, modifications of the receiving water monitoring requirements occurring after this initial period must comply with 40 CFR § 122.62. Such modifications also require EPA and DEP written approval. Ex A at 20. BWSC violated the Permit by abandoning its receiving water monitoring program without going through the required notice and comment procedure or obtaining written approval from EPA and DEP.

  D. *The Sections of the Permit Concerning SWMP Amendment on Which BWSC Relies do not Apply to the Monitoring Programs*

  BWSC relies on § I.B.7.c to support its contention that "a request by the Commission to replace or eliminate a program component would become effective after 60 days unless within that time EPA commented upon or denied the request" BWSC at 7.  Section I.B.7.c does not support this contention.  Section I.B.7.c's modification provision concerns the SWMP and does not relate to the Permit's monitoring requirements.  Permit Part I contains nine sections, identified as Sections I.A through I.I.  Of particular note are § I.B concerning the SWMP and § I.C concerning the "wet weather monitoring and screening requirements."  The amendment provisions of Permit § I.B.7.c, which contemplate that SWMP modifications take effect within 60 days unless EPA takes some action, are not applicable to the other sections of the Permit, including § I.C.  Section I.B.7.c is titled "Program Modification" and references the SWMP throughout, making this distinction abundantly clear.  Permit Section I.B.7 is titled "Storm Water Management Program Review and Modification."  Permit § I.B.7.c does not reference the Permit's monitoring requirements.  Ex A. at 11–12.

  The Permit's monitoring requirements are wholly separate from the Permit's SWMP requirements.  As BWSC admits, § I.C has its own limited modification provisions. BWSC at 15 – 18.  BWSC's contention that the modification provisions of § I.B also apply to modification of the monitoring requirements does not make sense in light of the separate monitoring requirement modification provisions in § I.C.  Furthermore, non-minor modifications outside the limited time periods set forth in the modification provisions of § I.C must be carried out under 40 CFR § 122.62 and require written approval from both EPA and DEP.  Ex A at 20.  In short, the modification provisions of the Permit concerning the SWMP in § I.B.7.c have no bearing on how BWSC can modify its monitoring requirements.

## CONCLUSION

For the reasons set forth in its opening and reply memoranda, CLF is entitled to summary judgment on the issues of liability raised in its motions.

Respectfully submitted this 27th day of October

CONSERVATION LAW FOUNDATION

By: __/**s**/Anthony Lappin Iarrapino_
Anthony Lappin Iarrapino, Esq.
BBO# 658109
Christopher M. Kilian, *pro hac vice*
15 E. State St. #4
Montpellier, Vermont 05602
Telephone: (802) 223-5992
aiarrapino@clf.org
ckilian@clf.org

/s/ Seth Kerschner
Seth Kerschner, Esq., *pro hac vice*
Shearman & Sterling LLP
599 Lexington Ave
New York, NY 10022
1.212.848.7402
seth.kerschner@shearman.com

/s/ Marion Harris
Marion Harris, *pro hac vice*
Shearman & Sterling, LLP
599 Lexington Avenue
New York, NY 10022
1.212.848.7123
marion.harris@shearman.com

Certificate of Service

I hereby certify that these documents filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) on October 27, 2010.  There are no nonregistered participants in this docket.

/s/ Anthony Iarrapino
15 East State St. #4

Montpelier, VT 05602
802-223-5992
aiarrapino@clf.org