UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 10-10250-RGS

CONSERVATION LAW FOUNDATION, INC.,

v.

BOSTON WATER AND SEWER COMMISSION;
VINCENT G. MANNERING, in his official capacity as
Executive Director of Boston Water and
Sewer Commission;
DENNIS A. DIMARZIO, in his official capacity as Chairman
of Boston Water and Sewer Commission;
CATHLEEN DOUGLAS STONE, in her official capacity as
Boston Water and Sewer Commissioner; and
MUHAMMAD ALI-SALAAM, in his official capacity as
Boston Water and Sewer Commissioner

MEMORANDUM AND ORDER ON PLAINTIFF'S
MOTION FOR PARTIAL SUMMARY JUDGMENT

December 21, 2010

STEARNS, D.J.

Conservation Law Foundation (CLF)[1] brought this "citizen suit" under section 505 of the Clean Water Act (CWA), 33 U.S.C. § 1365, seeking to redress the "significant water-quality problems and programmatic deficiencies" of the Boston Water and Sewer Commission's (BWSC) municipal separate storm sewer system (MS4).[2] CLF seeks declaratory judgments and injunctive relief related to the BWSC's alleged violation of a

---

[1]CLF is a non-profit environmental advocacy group with approximately 3,230 members, 1,655 of them reside in Massachusetts. Ninety of these members reside in Boston. CLF claims that its Boston-area members "have been and are adversely affected by [the Commission's] violations of the Clean Water Act and, until such time as Defendants come into compliance, will continue to be so." Compl. ¶ 6.

[2]The United States Environmental Protection Agency (EPA) is not a party to the lawsuit, although EPA has given indications that it may intervene.

National Pollutant Discharge Elimination System (NPDES) Permit authorizing MS4 discharges, see 33 U.S.C. §§ 1311(a) and 1342(p)(3)(B), and the applicable CWA regulations. CLF moves for partial summary judgment on six counts of the Complaint alleging discharge violations and monitoring failings,[3] as well as the BWSC's Fourth[4], Fifth[5], and Sixth[6] Affirmative Defenses. CLF's basic contentions are: (1) that the NPDES Permit mandates water quality standards that the BWSC has failed to meet; (2) that the BWSC has abdicated its responsibility to take remedial actions required by the CWA; and (3) that the BWSC has unilaterally altered its wet weather monitoring programs in ways that violate the express terms of the NPDES Permit and NPDES regulations.

The BWSC, for its part, argues that the CWA does not require that municipal

---

[3]Specifically, Count I (Violation of the CWA - Unlawful Discharges Causing or Contributing to Violation of Water Quality Standards), Count II (Unlawful Discharges of Toxic Substances in Toxic Amounts), Count VI (Violation of CWA - Failure to Update Stormwater Management Plan), Count IX (Violation of CWA - Failure to comply with Representative-Monitoring Requirements), Count X (Violation of CWA - Failure to comply with Receiving-Water Monitoring Requirements) and Count XI (Violation of CWA - Failure to comply with Outfall-Screening Requirements).

[4]FOURTH DEFENSE - The Plaintiff cannot recover on the claims set forth in the Complaint because those claims assume incorrectly that the Permit requires the Commission's stormwater discharges and the bodies of water to which they discharge to meet water quality standards whereas the Permit actually requires only that the Commission take practicable steps toward the goal of meeting those standards.

[5]FIFTH DEFENSE - The Plaintiff cannot recover on the claims set forth in the Complaint because the Permit imposes no requirements in addition to those established by applicable statutes, regulations, ordinances and other laws, and the Commission has complied with all such requirements of law.

[6]SIXTH DEFENSE - The claims set forth in the Complaint are barred, in part, because it alleges violations of supposed terms of the Permit that are, in fact, no longer parts of the Permit.

stormwater discharges comply with numeric water quality standards, and that the NPDES Permit issued by EPA explicitly incorporates an alternative "maximum extent practicable" standard.[7]  The BWSC contends that under the terms of the NPDES Permit, its obligation was to follow inherently flexible "best practices" – and not prescribed guidelines in reducing pollutant discharges – and that any alterations undertaken to its monitoring programs fully complied with the conditions of the Permit.

## BACKGROUND

The BWSC was established in 1977 as a "body politic" independent of the City of Boston.  The BWSC is charged with maintaining "a sound economical and efficient [Boston] water supply and distribution system and sanitary sewerage system." Mass. Acts of 1977, ch. 436, §§ 1-3.  The combined system incorporates sanitary sewers and storm water sewers with appurtenant catch basins and surface drains.[8]  Id. § 5.

Enacted in 1972, the CWA is the centerpiece of a federal regulatory regime intended to improve and protect the quality of the nation's surface waters.  Section 301 of the CWA, 33 U.S.C. § 1311, prohibits the discharge of any pollutant, by any person, from any point source, into the waters of the United States (including the contiguous coastal waters), except when expressly authorized by an EPA-issued or EPA-approved NPDES

---

[7] In its Reply Brief, CLF asserts that the BWSC's Opposition to its motion is "an untimely collateral attack on the Permit." Pl. Reply at 10-11.

[8] The BWSC's MS4 covers some 17,429 acres (approximately 57 percent of the surface area of Boston).  It includes 19,708 storm drains, or "catch basins," for the collection of stormwater, 424 miles of storm drainage pipes, and 201 storm drain outfalls. The areas of Boston that are not included in the MS4 are served by combined sewers, sanitary sewers, or are comprised of undrained open space.

permit. See 33 U.S.C. § 1311(a); 33 U.S.C. § 1362(12)(A)(7); 40 C.F.R. § 122.2. The Commonwealth of Massachusetts has not established a federally-approved state NPDES program pursuant to § 402(b) of the CWA, 33 U.S.C. § 1342(b). Consequently, in Massachusetts the NPDES permit program is administered by EPA pursuant to section 402(a) of the Act, 33 U.S.C. § 1342(a). However,

> EPA may not issue a permit unless the State Water Pollution Control Agency with jurisdiction over the receiving waters certifies that the effluent limitations contained in the permit are stringent enough to assure that the discharges will not cause the receiving water to violate State Water Quality Standards. The staff of the Massachusetts Department of Environmental Protection [DEP] has reviewed the draft permit and advised EPA that the limitations are adequate to protect water quality.

Iarrapino Decl. - Ex B at 10 (Permit Fact Sheet).

In the early 1990s, the BWSC submitted an application to EPA for a NPDES permit to operate the MS4. The application included a Stormwater Management Plan (SWMP) developed in 1993 by the BWSC. The SWMP listed seventeen pollution control measures that were to be implemented under the anticipated permit. On September 29, 1999, EPA approved the NPDES Permit at issue in this litigation.[9] The Permit became effective October 29, 1999 and, like all NPDES permits, had a term of five years.

As required under federal regulations, EPA generated a Fact Sheet detailing the

---

[9]The Permit authorized the BWSC to discharge storm water into Belle Island Inlet, Boston Harbor, Boston Inner Harbor, Brook Farm Brook, Bussey Brook, Canterbury Brook, Chandler's Pond, Charles River, Chelsea River, Cow Island Pond, Dorchester Bay, Fort Point Channel, Goldsmith Brook, Jamaica Pond, Little Mystic Channel, Mill Pond, Millers River, Mother Brook, Muddy River, Mystic River, Neponset River, Old Harbor, Patten's Cove, Reserved Channel, Sprague Pond, Stony Brook, Turtle Pond and unnamed neighboring wetlands, brooks and streams. See Iarrapino Decl. - Ex. A (Authorization to Discharge Under the National Pollutant Discharge Elimination System, Boston Water and Sewer, Permit No. MAS010001).

4

legal and factual bases for the issuance of the Permit, as well as a summary of the NPDES permitting requirements. See Iarrapino Decl. - Ex. B. The NPDES Permit's Fact Sheet stated that "MS4s are required to achieve compliance with Water Quality Standards." Id. at 2. The Fact Sheet also included a directive from EPA that the BWSC "explore opportunities for pollution prevention measures, while reserving the more costly structural controls for higher priority watersheds or where pollution prevention measures prove unfeasible or ineffective in achieving water quality standards." Id. at 3.

While section I(C)(1) of the Permit stated that "[t]here have been no numeric effluent limits established for this permit," its list of statutory requirements mandated that the BWSC "select measures or controls to satisfy the following water quality prohibitions: No discharge of pollutants in quantities that would cause a violation of State water quality standards." It also prohibited the "discharge of toxics in toxic amounts." Iarrapino Decl. - Ex. A at 5. The Permit further required the BWSC to "implement a wet-weather monitoring program for the MS4" in order to "assess the effectiveness and adequacy of control measures implemented under the [SWMP]; estimate annual cumulative pollutant loadings from the MS4; estimate event mean concentrations and seasonal pollutants in discharges from all outfalls; identify and prioritize portions of the MS4 requiring additional controls, and identify water quality improvements of degradation." Id. at 13. As an integral component of the wet-weather monitoring program, the Permit stipulated that the BWSC "shall monitor a minimum of five (5) representative drainage areas to characterize the quality of storm water discharges from the MS4." Id. at 14(I)(C)(1)(a). The Permit also directed that the BWSC "shall monitor a minimum of four (4) receiving waters (3) times a

year throughout the permit term to characterize water quality impacts of storm water discharges from the MS4." Id. at 14. As part of its wet-weather monitoring program, the BWSC was to "screen **all** major outfalls at least once during the permit term"[10] and to "record the structural integrity of the outfall (if visible); physical observations of the discharge (if visible) such as color and smell; and visible water quality impacts such as floatables, oil sheen, or evidence of sedimentation in the vicinity of the outfall (e.g. sandbars)." Id. at 16 (emphasis added).

The Permit further required the BWSC to "prepare and submit an annual report" that "shall include the following separate sections, with an overview for the entire MS4. . . . 2. Proposed changes to the storm water management program(s); . . . 4. A summary of the data, including monitoring or screening data, that is accumulated throughout the reporting year; . . . 8. Identification of water quality improvements or degradation attributable to the permittee." Id. at 18. The annual reports were to include data gleaned from the wet-weather monitoring program, including representative monitoring results, any conclusions to be drawn from the data, and an explanation of any updates or revisions to the BWSC's pollution control efforts taken in light of the data.

In compliance with the conditions of the Permit, the BWSC began monitoring stormwater quality in the five representative MS4 drainage areas. In 2001, the BWSC reduced the number of representative drainage area monitoring sites from five to three: a high density residential area in Charlestown (Mount Vernon Street, Drain Manhole

---

[10]In its 2001 Annual Stormwater Management Report, the BWSC reported that it maintained and oversaw 95 major outfalls. By 2009, the major outfall population had risen slightly to 97.

27K397); a mixed use area in Hyde Park (Hyde Park Avenue, Drain Manhole 5F208); and an open space area in Hyde Park (Wesley G. Ross, Drain Manhole 7G243). The monitoring systems at these three sites reported discharges of E. coli and fecal coliform bacteria, as well as traces of copper and zinc, at levels in excess of those permitted by Massachusetts water quality standards.

Instead of the four wet-weather receiving waters monitoring sites designated in the Permit, the BWSC established three in 2001: Bussey Brook and Canterbury Brook in Roslindale, and Chandler Pond in Brighton. Monitoring at each of these sites documented violations of Massachusetts water quality standards governing discharges of E. coli and fecal coliform bacteria, as well as copper, zinc, and dissolved oxygen.[11]

---

[11]The Program Summary of the Water Monitoring Program prepared by Rizzo Associates for the BWSC for submission to the EPA reported that

> [l]evels of dissolved metals (copper and zinc) measured by the monitoring program consistently exceeded applicable water quality criteria in both the upstream and downstream wet weather samples collected in Bussey Brook. The dissolved copper criterion was exceeded in 73 percent of the samples taken at the upstream station and 60 percent of the samples from the downstream station, while dissolved zinc levels exceeded the applicable criterion in 60 percent of the upstream samples and 67 percent of the downstream samples. . . . Bacterial levels in Bussey Brook consistently exceeded applicable water quality standards in both wet and dry weather as well, with concentrations in the tens of thousands.

Iarrapino Decl. - Ex. N at 8.

Monitoring results at Chandler Pond in Brighton showed exceedances of the dissolved zinc criterion in 33 percent of the wet-weather samples, with no exceedances measured in dry weather. Twenty-six percent of the wet-weather samples from this 12-acre pond indicated violations of the E. Coli standard (as compared to none during dry weather). The Canterbury Brook samples showed exceedances of the toxic metals criterion for dissolved copper in 33 percent of the samples collected, although the Program Summary cautioned that flaws in the sampling protocols may have resulted in the underreporting of

In April of 2001, the BWSC produced its first (2000) Annual Stormwater Management Report. It afterwards submitted signed and certified Annual Stormwater Management Reports for 2001 through 2009. See Iarrapino Decl. SOF - Exs. D - L. From 2004 through 2009, the annual reports included a summary of "general conclusions" made "[b]ased on the data generated under the representative stormwater monitoring programs."[12] See Iarrapino Decl. - Ex. L at 4-4; Ex. K at 4-4; Ex. J at 4-3; Ex. I at 4-3 to 4-4; Ex. H at 4-4; and Ex. G at 3-4. Among the conclusions were that:

> (b)acterial levels in stormwater **consistently exceed applicable water quality standards**, particularly those based on fecal coliform concentration, even in areas known to have no illegal sanitary connections.
>
> Levels of copper and zinc in runoff from the Boston area **consistently exceed applicable water quality criteria, particularly in dissolved form**. The fact that the metals occur primarily in dissolved form, suggests that conventional BMPs aimed at solids control will be ineffective at addressing metals toxicity. Data from the mixed use area indicate higher metals concentrations and higher proportions of dissolved metal in runoff than are reported in the national database.

Id. (emphasis added). The 2001, 2003, and 2004 Reports iterated the statement that "[n]o changes to the BWSC's stormwater management program and pollution prevention activities are proposed at this time. Over the next year the BWSC will continue to review these programs and activities, and supplement and refine them as appropriate." Id. - Ex.

---

exceedances. Standards for dissolved zinc were exceeded in 67 percent of the upstream samples as compared to 73 percent of those gathered downstream. Id. at 9.

In a prefatory note, the Program Summary stated that "[t]he frequency of exceedances may in fact have been higher, but the detection limits used in a number of the laboratory analyses were higher than the water quality criteria." Id.

[12]The original Permit expired on October 29, 2004. Since that time, the BWSC has operated the MS4 under an administrative continuation of the Permit.

8

D at 4-1; Ex. F at 4-1; Ex. G at 4-1. The reports also stated that no changes were made to the stormwater management program or pollution prevention efforts in 2002, 2005, 2006, 2007, 2008, and 2009. Id. - Ex. E at 4-1; Ex. H at 5-1; Ex. I at 5-1; Ex. J at 5-1; Ex. K at 5-2; Ex. L at 5-1.

The BWSC's position is that it faithfully conformed to EPA and DEP procedures in making alterations to the monitoring and screening programs. Defs.' - Ex. P at 4-6; Ex. Z. In its initial monitoring proposal, the BWSC suggested changes to the requirements for representative drainage area monitoring. Id. - Ex. U. In the 2001 Stormwater Management Report, the BWSC proposed to weed out what it characterized as "unproductive" wet-weather screening by decreasing the number of receiving waters sampled, while at the same time increasing the number of points sampled at each site and the total number of actual samples gathered. Id. - Ex. X at 4-3, 4-4. In a letter dated May 13, 2003, DEP approved the BWSC's requested modifications to the Stormwater Quality Monitoring Program as "reasonable and appropriate." The DEP letter specifically permitted the following modifications.

> 1. The stormwater quality monitoring schedule changes due to dry weather in the fall of 2001,
>
> 2. Substitution of mixed land use and open space land use drainage areas for the planned transportation/industrial land use area in the monitoring program based on the BWSC's evaluation of GIS data on land use in Boston,
>
> 3. Elimination of wet weather screening of major outfalls, and
>
> 4. Changes to the Wet Weather Receiving Water Quality Monitoring.

Id. - Ex. Z. On February 27, 2004, in a letter to Linda Murphy, the Director of EPA's Office

of Ecosystem Protection, Glen Haas, the Acting Assistant Commissioner of the Bureau of Resource Protection of DEP, and Sabin Lord, the Regional Director of DEP, the BWSC "propose[d] to eliminate Representative . . . water monitoring from its next permit" and stated its belief that "there would be little benefit to performing more stormwater . . . monitoring." Iarrapino Decl. - Ex. M. In a reply dated July 5, 2007, Stephen Perkins, Director of EPA's Office of Ecosystem Protection, wrote to John Sullivan, the Chief Engineer at the BWSC, stating that "[w]hile EPA concurs that [the BWSC] has fulfilled its obligations with respect to the required representative monitoring, it does not agree with [the BWSC's] position that receiving water quality monitoring requirements have been satisfied." Id. - Ex. Q at 12. Perkins emphasized that "receiving water quality monitoring is a recurring requirement to be implemented throughout the permit term . . . therefore [the BWSC] must continue this component of its monitoring plan until the permit is re-issued." Id. at 13.

CLF filed this action on February 2, 2010. Based on what it deems as binding "admissions" in the BWSC's Answer to the Complaint and the annual reports filed by the BWSC from 2001 until 2009, CLF filed this motion for partial summary judgment on September 20, 2010.[13] The court heard oral argument on the motion on December 9, 2010.

## DISCUSSION

---

[13] As an example, CLF cites the statement made in the BWSC's Answer that only "twenty-four major outfalls" had been screened and that "wet-weather outfall screening was discontinued at the end of 2000." Defs.' Answer ¶ 105.

Summary judgment is appropriate where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2). "A 'genuine' issue is one that could be resolved in favor of either party, and a 'material fact' is one that has the potential of affecting the outcome of the case." Calero-Cerezo v. U.S. Dep't of Justice, 355 F.3d 6, 19 (1st Cir. 2004), citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-250 (1986).

CWA mandates that NPDES MS4 permits "require controls to reduce the discharge of pollutants to the maximum extent practicable, including management practices, control techniques and systems, design and engineering methods, and such other provisions as . . . appropriate for the control of such pollutants." 33 U.S.C. § 1342(p)(3)(B)(iii). The EPA, when acting as the permit issuer, must impose conditions that "ensure compliance" with state water quality standards such as those adopted by the Commonwealth of Massachusetts "sufficient to carry out the purpose of the CWA."[14]  40 C.F.R. § 122.4(d).

I agree with the BWSC's statement (although not with all of its intended implications) that "[t]he Clean Water Act does not mandate that permits issued by EPA for municipal stormwater discharges require compliance with numeric water quality standards." The Permit specifically says so – "[t]here have been no numeric effluent limits established for

---

[14]Massachusetts has adopted numerous water quality standards and criteria that are applicable to the Class B and Class SB receiving waters affected by the BWSC's MS4 discharges, see 314 CMR 4.05 (4)(b) (Class SB), 314 CMR 4.05(3)(b) (Class B), which are not explicitly referenced in the Permit.  Similarly, the Fact Sheet directs that "MS4s are required to achieve compliance with Water Quality Standards. However, "these standards are not specified.

11

this [P]ermit." The Permit rather adverts to the language of the CWA in requiring that the BWSC institute best management practices to reduce the discharge of pollutants from the MS4 to the "maximum extent practicable." Iarrapino Decl. - Ex. A at 5. The Permit directs the BWSC to "select measures or controls to satisfy the articulated water quality prohibitions" with the exhortation that it allow "no discharge of toxins in toxic amounts; no discharge of pollutants in quantities that would cause a violation of state water quality standards."

Both parties find comfort for their positions in <u>Defenders of Wildlife v. Browner</u>, 191 F.3d 1159 (9th Cir. 1999). In <u>Defenders of Wildlife</u>, the Court found that the portion of section 1342(p)(3)(B)(iii) that states that "'[p]ermits for discharges from municipal storm sewers . . . shall require . . . such other provisions as the Administrator . . . determines appropriate for the control of such pollutants' . . . . gives the EPA discretion to determine what pollution controls are appropriate."[15] <u>Id</u>. at 1166-1167.

> Under that discretionary provision, the EPA has the authority to determine that ensuring strict compliance with state water-quality standards is necessary to control pollutants. The EPA also has the authority to require less than strict compliance with state water-quality standards. The EPA has adopted an interim approach, which "uses best management practices (BMPs) in first-round storm water permits . . . to provide for the attainment of water quality standards." The EPA applied that approach to the permits at issue here. Under 33 U.S.C. § 1342(p)(3)(B)(iii), the EPA's choice to include either management practices or numeric limitations in the permits was within its discretion. See <u>NRDC II</u>, 966 F.2d [1292], 1308 [(9th Cir. 1992)] ("Congress did not mandate a minimum standards approach or specify that EPA develop minimal performance requirements."). In the circumstances, the

---

[15]Under the Administrative Procedures Act (APA), 5 U.S.C. §§ 701-706, a court reviews EPA's decision to issue a permit under an "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" standard. See 5 U.S.C. § 706(2)(A).

EPA did not act arbitrarily or capriciously by issuing permits to Intervenors. Id. The Court also noted (after setting out the pertinent rules of statutory construction) that the statute "is not merely silent," but replaces the requirements of section 1311 (effluent limitations) with a "maximum extent practicable" test.[16] Id. at 1165.

The contested Permit as issued by EPA and Massachusetts DEP provides that "any modification, suspension or revocation . . . shall be effective only with respect to the Agency taking such action." Iarrapino Decl. - Ex. A at 20. The BWSC contends that the Permit modifications that it put into effect were submitted for pre-clearance and ratified by both agencies. The record, as it stands, makes clear that DEP affirmatively approved the BWSC's proposed changes. EPA's historical position, however, is opaque. EPA, by its silence, has either affirmatively acquiesced in the BWSC's revisions of the monitoring requirements or, alternatively, it has simply failed to enforce the strict conditions of the Permit.[17] The Permit requires that the BWSC obtain the "prior approval of the Director" for

---

[16]CLF argues that the decision works against the BWSC because in Defenders of Wildlife, the Ninth Circuit rejected the municipalities' argument that the CWA prohibited EPA from mandating strict compliance, 191 F.3d at 1166-1167, holding instead that EPA has the discretionary authority to "determine that ensuring strict compliance with water quality standards is necessary to control pollutants," and to exercise its authority by imposing numeric effluent limitations or Best Management Practices in issuing a permit. Id.

[17]As CLF points out, EPA inaction is the sine qua non of a CWA citizen suit. See 33 U.S.C. §§ 1365(a)- (b)(2) (Under the CWA, a citizen may commence a civil action against any person who is alleged to be violating the Act, but only when federal and state enforcement agencies fail to commence and diligently prosecute an enforcement action prior to the filing of a duly noticed citizen suit complaint in a federal district court). See, e.g., Atl. States Legal Found. v. Eastman Kodak Co., 933 F.2d 124, 127 (2d Cir. 1991) ("The purpose of the citizen suit is to stop violations of the Clean Water Act that are not challenged by appropriate state and federal authorities.").

modifications, unless "replacing or eliminating an ineffective or infeasible B[est] M[anagement] P[ractice] specifically identified in the SWMP with an alternative BMP." Id. at 12. The BWSC argues that the changes it made to the monitoring program were not "modifications," but adjustments, and that the failure of the Director to comment on or revoke these changes within the sixty days provided for in the Permit confirms this view.[18] So it seems.

The more difficult and fact-driven question is whether the BWSC implemented controls and measures necessary to reduce discharges by the "maximum extent practicable." The answer requires an understanding of the extent to which factors outside of the BWSC's control might have impeded its ability to meet whichever federal or state water quality standards applied.[19] The SWMP, submitted with the Permit application, identified a number of pollutant sources arguably outside of the BWSC's ability to regulate (roadways, flood control projects, pesticide and fertilizer applications, illicit discharges, and industrial and high risk runoff). Iarrapino Decl. - Ex. A at 5-10. At the same time, the Permit states that "[t]he permittee has demonstrated and shall maintain legal authority to control discharges to and from those portions of the MS4 which it owns or controls." Id. at 10.

CLF's argument that the court can grant partial summary judgment and proceed directly to the consideration of the appropriate relief, while tempting, must be resisted in the

---

[18]At oral argument, counsel for the BWSC contended that because the frequency of monitoring was increased, EPA or DEP authorization was not required in the first instance.

[19]The BWSC contends that it does not have the legal power or regulatory authority to carry out many of the pollution prevention and stormwater management program desiderata set out in the Permit. See Defs.' - Ex. R (BWSC Enabling Act).

absence of any factual determination of whether the BWSC has fulfilled its obligations under the Permit to the "maximum extent practicable" (the standard imposed by the CWA and EPA). That determination can only be made on a stipulation of facts (which is not expected) or on a record developed by discovery (which is yet to take place).

## ORDER

For the foregoing reasons, CLF's motion for partial summary judgment and other relief is <u>DENIED</u>. The parties will submit a joint proposed scheduling order within twenty-one (21) days of the date of this Memorandum and Order.

SO ORDERED

/s/ Richard G. Stearns
_____
UNITED STATES DISTRICT JUDGE